[No. A031120. First Dist., Div. Four. Sept. 24, 1986.]

CYNTHIA BOWMAN et al., Plaintiffs and Respondents, v.
CITY OF PETALUMA et al., Defendants and Respondents;
DAON CORPORATION et al., Real Parties in Interest and Appellants.

COUNSEL

Drummy, Garrett, King & Harrison, Stephen C. Drummy, J. Scott Schoeffel and Jeffrey M. Richard for Real Parties in Interest and Appellants.

Leslie R. Perry and Luke & Perry for Plaintiffs and Respondents.

No appearance for Defendants and Respondents.

OPINION

**CHANNELL, J.**—This is an appeal from a judgment in mandamus requiring the City of Petaluma (City) to set aside certain enactments approving a subdivision development. We hold that (1) the trial court erred by extending review of the City's actions beyond the question whether they were supported by substantial evidence; and (2) analyzed by this standard, the City's actions did not violate the California Environmental Quality Act (CEQA) (Pub. Resources Code, § 21000 et seq.).[1]

## I.

Since 1980 appellant Daon Corporation (Daon) has owned approximately 151 contiguous acres of unimproved property on the southwestern outskirts

---

[1]Unless otherwise indicated, all citations by section number are to the Public Resources Code. The portion of the Administrative Code governing proceedings under CEQA (Guidelines for Implementation of the California Environmental Quality Act, Cal. Administrative Code, tit. 14, § 15000 et seq.) is cited as Guidelines.

of Petaluma. Attempts to develop the property have been underway since at least 1977, when a previous owner received an initial allotment from the City to construct single family homes. The project was then known as "La Cumbre."

In 1978 a draft environmental impact report (EIR) was prepared and circulated in accordance with CEQA. The review period ended on October 15, 1978. In July 1979, after a hearing, the city council certified the EIR as complete and amended its general plan and environmental design plan to accommodate the proposal.

By 1983 the proposed project, renamed "Sonoma Highlands," had been modified in some respects. In particular, the traffic design no longer provided for direct access between the project and "B" Street; the bulk of project traffic was now routed to "D" Street.

In connection with Daon's pending application for tentative map approval and rezoning, the planning commission requested an "updated environmental package," including an updated traffic report. In June 1983 Daon submitted the requested environmental materials. In September, after two public hearings, the planning commission approved the EIR. On February 21, 1984, after a public session, the city council approved the EIR "as amended" and approved Daon's applications subject to some 56 conditions.

Four area residents (objectors) filed this action alleging that the City's actions violated CEQA. After a hearing, the trial court rendered judgment in objectors' favor, based upon its view that the City was required to prepare a "subsequent or supplemental" EIR. A writ of mandate issued, directing the City to set aside the ordinances and resolutions approving the project. The City complied with the writ, and this appeal followed.[2]

II.

The trial court's decision that the City should have prepared a subsequent or supplemental EIR rested on its analysis of the "standard of review" for an agency's failure to prepare a subsequent EIR.[3] The court concluded that "the appropriate standard is the same as that to be applied in determining whether an EIR must be prepared in the first instance, namely, whether it

---

[2]The City has not filed a brief. Its compliance with the writ was a waiver of appeal as to the judgment. (*City of Carmel-by-the-Sea* v. *Board of Supervisors* (1982) 137 Cal.App.3d 964, 970-971 [187 Cal.Rptr. 379].)

[3]We find no indication that the City was presented with an objection based on failure to prepare a subsequent EIR. (See § 21177, subd. (a) [barring charge of noncompliance with CEQA unless grounds were presented to public agency].) Failure to exhaust administrative remedies was pleaded below but apparently not pursued there. The issue has not been raised here.

can be fairly argued on the basis of substantial evidence that the project may have a significant environmental impact[,] *No Oil, Inc.* v. *City of Los Angeles* (1974) 13 Cal.3d 68 [118 Cal.Rptr. 34, 529 P.2d 66], and further, that if there is substantial evidence that the proposed project might have a significant environmental impact, evidence to the contrary is not sufficient to support a decision to dispense with preparation of an EIR. *Friends of 'B' Street* v. *City of Hayward* (1980) 106 Cal.App.3d 988, 1002 [165 Cal.Rptr. 514]."

As the trial court acknowledged, the rule it adopted deals with the kind of showing which requires preparation of an *original EIR*. Under section 21151, an EIR must be prepared whenever a project "may have a significant effect on the environment."[4] In *No Oil, Inc., supra,* section 21151 was interpreted to require preparation of an EIR "whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact." (13 Cal.3d at pp. 75, 83-85.) This test was applied in *Friends of "B" Street, supra,* to affirm a judgment invalidating a decision not to prepare an EIR.

However those cases do not alter the "standard of review" to be applied to administrative decisions under CEQA, and the test they use does not apply to an agency's decision, after completion of an original EIR, not to require another EIR. Both *No Oil* and *Friends of "B" Street* expressly acknowledge that judicial review of agency action under CEQA is governed by sections 21168[5] and 21168.5[6] of the Public Resources Code. (13 Cal.3d at pp. 74-75; 106 Cal.App.3d at pp. 1001-1002.) Under those sections the questions for the court are "(1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the

---

[4]Section 21151 provides: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. When a report is required by Section 65402 of the Government Code, the environmental impact report may be submitted as a part of that report. [¶] For purposes of this section, any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5."

[5]Section 21168 provides: "Any action or proceeding to attack, review, set aside, void or annul a determination, finding, or decision of a public agency, made as a result of a proceeding in which by law a hearing is required to be given, evidence is required to be taken and discretion in the determination of facts is vested in a public agency, on the grounds of noncompliance with the provisions of this division shall be in accordance with the provisions of Section 1094.5 of the Code of Civil Procedure. [¶] In any such action, the court shall not exercise its independent judgment on the evidence but shall only determine whether the act or decision is supported by substantial evidence in the light of the whole record."

[6]Section 21168.5 provides: "In any action or proceeding, other than an action or proceeding under Section 21168, to attack, review, set aside, void or annul a determination, finding, or decision of a public agency on the grounds of noncompliance with this division, the inquiry shall extend only to whether there was a prejudicial abuse of discretion. Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination or decision is not supported by substantial evidence."

agency making the decision abused its discretion by failing to proceed in the manner required by law." (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753].)[7]

Thus the applicable standard of review is the "substantial evidence" test. Substantial evidence has been defined as "relevant evidence that a reasonable mind might accept as adequate to support a conclusion" (*Hosford* v. *State Personnel Bd.* (1977) 74 Cal.App.3d 302, 307 [141 Cal.Rptr. 354]), or "evidence of 'ponderable legal significance . . . reasonable in nature, credible, and of solid value'" (*County of San Diego* v. *Assessment Appeals Bd. No. 2* (1983) 148 Cal.App.3d 548, 555 [195 Cal.Rptr. 895], quoting *Ofsevit* v. *Trustees of Cal. State University and Colleges* (1978) 21 Cal.3d 763, 773, fn. 9 [148 Cal.Rptr. 1, 582 P.2d 88]). Under the traditional statement of the rule the court may not "weigh the evidence." (See 8 Witkin, Cal. Procedure (3d ed. 1985) Extraordinary Writs, §§ 255, 265, pp. 880, 892.) Some authorities have indicated that the evidence may be weighed "[i]n a sense" (Cal. Administrative Mandamus (Supp.) *op. cit. supra,* § 5.75, p. 85), or to the extent necessary to "fairly estimate its worth" (*County of San Diego, supra,* 148 Cal.App.3d, p. 555).

In any event it is clear that the rule of "substantial evidence" is quite distinct from the alternative standard of review, which empowers a trial court, in reviewing certain types of administrative determinations, to exercise its "independent judgment" to determine whether the weight of the evidence supports the agency's determination. (Cal. Administrative Mandamus (Supp.) *op. cit. supra,* § 5.74, p. 82; 8 Witkin, *op. cit. supra,* §§ 254, 256, at pp. 879 and 881.) Where this rule applies, a trial court may conduct a "limited trial de novo." (*Bixby* v. *Pierno* (1971) 4 Cal.3d 130, 143 [93 Cal.Rptr. 234, 481 P.2d 242].)

 Despite the clear applicability of sections 21168 and 21168.5, the trial court expressly exercised its own judgment to determine whether the requisites for a subsequent or supplemental EIR were present. In doing so it apparently adopted the statement in *Friends of "B" Street, supra,* 106 Cal.App.3d at page 1002, that the agency's failure to prepare an EIR must be set aside "if the *trial court* perceives substantial evidence that the project

---

[7]For purposes of this appeal there appears to be no material distinction between sections 21168 and 21168.5. Section 21168 makes Code of Civil Procedure section 1094.5 applicable where the agency must conduct public hearings and take evidence. (See *Dehne, supra,* at p. 835; Cal. Administrative Mandamus (Cont.Ed.Bar Supp. 1985) § 2.7A, pp. 15-16.) The parties have assumed that section 21168 applies here. They have raised no issue based on section 1094.5, and have not addressed the question whether public hearings were required by law. (See *Friends of Lake Arrowhead* v. *Board of Supervisors* (1974) 38 Cal.App.3d 497, 517-518 [113 Cal.Rptr. 539] [no showing that any local ordinance brought tentative map approval within 21168]; but see *Rural Landowners Assn.* v. *City Council* (1983) 143 Cal.App.3d 1013, 1018-1019 [192 Cal.Rptr. 325] [tentative map approval within 21168 pursuant to notice provisions of Subdivision Map Act, Gov. Code, § 66410 et seq.].) Under these circumstances we will not attempt to determine which section applies.

might have [a significant environmental] impact." (Italics added.) That opinion, however, does not support the substitution of the trial court's judgment for that of the agency. It expressly acknowledges that judicial review of CEQA determinations is governed by the substantial evidence rule (*id.,* at pp. 1001-1002); therefore it cannot support the adoption of the independent judgment test. Its holding should be understood as resting on the nature of the "fair argument" test drawn from section 21151. In effect *Friends of "B" Street* holds that the determination before the court raised only a question of law, namely, the sufficiency of the evidence to support a fair argument. Such a question, under that decision, may be independently analyzed by the courts regardless of the scope of judicial review. (See *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 144 [trial court determines whether errors of law were committed by agency].)

The *No Oil/"B" Street* test is inapplicable here because section 21151, on which those cases rest, sets a quite different standard from the one provided by section 21166, which governed the City's decision here. Whereas section 21151 requires an EIR if the project "may have a significant effect on the environment," section 21166 provides that an agency may *not* require preparation of another EIR unless "substantial changes" in the project or its circumstances will require "major revisions" to the EIR.[8] The two statutes serve quite different purposes and have correspondingly different effects. The question addressed by section 21151 is whether *any* environmental review is warranted. CEQA procedures reflect a preference for resolving doubts in favor of such review. (See § 21080, subd. (c); Guidelines, 15061, subd. (b)(3); 15063; 15064, subd. (h); 15070; *No Oil, supra,* at pp. 83-84.) In the present case, however, section 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired (§ 21167, subd. (c)), and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process. Thus, while section 21151 is intended to create a "low threshold requirement for preparation of an EIR" (*No Oil, supra,* at p. 84), section 21161 indicates a quite different intent, namely, to restrict the powers of agencies "by prohibiting [them] from requiring a subsequent or supplemental environmental impact report"

---

[8]Section 21166 provides: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

No contention has been made that the instant case is governed by subdivision (c), and we discern no "new information" of the kind described there.

unless the stated conditions are met. (*Review of Selected 1977 California Legislation* (1978) 9 Pacific L.J. 281, 642, italics deleted.)

■ Section 21166 is intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved. This purpose appears not only from its prohibitory language ("*no* subsequent or supplemental environmental impact report . . . *unless* . . .") but also from legislative context and history. Chapter 6 of CEQA, in which section 21166 appears, is entitled "Limitations." Similar procedural limits and protections appear elsewhere in that chapter and throughout the act. (E.g., §§ 21167 [time limits for court actions]; 21167.2 [conclusiveness of EIR on responsible agencies if not challenged within time limits]; 21167.6 [expedited preparation of record for court action, limits on extensions of time, time preference on appeal]; 21168 [limited scope of judicial review]; 21168.5 [same]; 21168.3 [calendaring preference]; 21168.9 [requirement that court specify action necessary for compliance]; 21003 [various steps to avoid delay, etc.].) These statutes effectuate the Legislature's expressed concern for balancing environmental considerations against the social and economic burdens of compliance. (See §§ 21000-21003 [policy statements]; 21081, subd. (c) [social or economic considerations making mitigation not feasible]; 21085 [limitation on reduction in housing units as mitigation measure]; Guideline 15021.) The 1977 amendment extending section 21166 to supplemental reports was part of a larger bill attempting to reduce the delays in the environmental review process. (Stats. 1977, ch. 1200, §§ 2-22, pp. 3997-4007.) The bill as a whole was "designed to eliminate much of the uncertainty in the application process and to expedite development project approval." (*Review of Selected 1977 California Legislation, op. cit. supra,* at p. 643.)

Nor does existing authority support the equation of section 21151 with 21166. In *Sutter Sensible Planning, Inc.* v. *Board of Supervisors* (1981) 122 Cal.App.3d 813 [176 Cal.Rptr. 342], an EIR was redrafted in response to numerous criticisms, and a "revised final" EIR, containing "new information" and effecting a "fundamental reorganization" of the report (*id.,* at p. 817) was made available to the public no more than twelve days before the meeting at which it was finally approved. The court found no statute or regulation governing the situation, but considered the procedures for processing subsequent or supplemental EIR's to be the best available analogy. (*Id.,* at pp. 821, 822; see Guidelines, § 15067.5.) It also observed that section 21166 did not *prevent* applying those procedures to the revised EIR, because that section "contemplate[s] an adequate initial EIR and [does] not *preclude* a subsequent or supplemental EIR from being prepared where the initial EIR was inadequate." (*Id.,* at p. 822, citing 60 Ops.Cal.Atty.Gen.

335, 340-341 (1977), italics added.) The case fell within neither the letter nor the spirit of section 21166 and does not stand for any rule concerning judicial review of an agency's decision not to prepare a supplemental EIR.

In *Stevens* v. *City of Glendale* (1981) 125 Cal.App.3d 986 [178 Cal.Rptr. 367], the trial court invalidated a city's certification of an EIR and ordered a resumption of proceedings to consider certain impacts not addressed in the draft EIR. The judgment was affirmed, apparently on the basis of the trial court's finding that no public notice had been given as to certain modifications incorporated in the final EIR. (*Id.,* at pp. 998-999, see pp. 990-991.) The court expressly refrained from determining whether a subsequent EIR was required under section 21166, noting instead that since the EIR process had not been completed, the question was "premature." (*Id.,* at p. 999.)

In *Mira Monte Homeowners Assn.* v. *County of Ventura* (1985) 165 Cal.App.3d 357 [212 Cal.Rptr. 127], a decision to certify an EIR was set aside where, four days before the hearing at which the EIR was certified, a resurvey of the project site revealed a "previously unidentified encroachment" on certain sensitive wetlands. (*Id.,* at p. 361.) Without discussing the effects of the substantial evidence standard of review, the court said that this discovery was a change in circumstances requiring "further environmental evaluation by way of a subsequent or supplemental report." (*Id.,* at pp. 364-365.) The court noted that the affected wetlands were recognized by the state as a diminishing resource requiring special protection, that they contained five endangered plant species, and that the procedures followed by the county had deprived the public of meaningful participation in these issues. (*Ibid.*) Accordingly it held the EIR legally inadequate. (*Id.,* at p. 365.)[9]

■ None of these cases dealt with the precise question presented here, which is the nature of the test to be applied in reviewing the City's failure to prepare a subsequent EIR. We believe the pertinent statutes leave no doubt that the test is whether the record as a whole contains substantial evidence to support a determination that the changes in the project were not so "substantial" as to require "major" modifications to the EIR.[10]

---

[9]The court didn't distinguish between the propriety of requiring a subsequent EIR and the legal sufficiency of an original EIR. We question the applicability of section 21166 where the original EIR has not been finally certified as complete. (See *Stevens* v. *City of Glendale, supra,* 125 Cal.App.3d at p. 999 [where certification of EIR was vacated, it would be "premature" to require a supplemental EIR]; § 21166, subd. (c) [subsequent EIR may be prepared where information was not available when the original EIR was "certified as complete"].)

[10]Daon urges us to use the "reasonableness" test adopted by several federal courts. Without addressing the differences, if any, between that test and the one used here, we repeat that the rule of decision is legislatively prescribed and we are not free to choose another.

## III.

█ Our role here is precisely the same as the trial court's. "'[I]n an administrative mandamus action where no limited trial de novo is authorized by law, the trial and appellate courts occupy in essence identical positions with regard to the administrative record, exercising the appellate function of determining whether the record is free from legal error. [Citations.]' (*Honey Springs Homeowners Assn.* v. *Board of Supervisors* (1984) 157 Cal.App.3d 1122, 1135, fn. 10 [203 Cal.Rptr. 886].) Thus, the conclusions of the superior court, and its disposition of the issues in this case, are not conclusive on appeal. (*Lewin* v. *St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 387 [146 Cal.Rptr. 892].)" (*Orinda Assn.* v. *Board of Supervisors* (1986) 182 Cal.App.3d 1145, 1160 [227 Cal.Rptr. 688]; see *Bixby* v. *Pierno, supra,* 4 Cal.3d at p. 149.) Accordingly we turn to a review of the facts surrounding the modifications to the proposal affecting vehicular access to the project.

"D" Street is located near the eastern boundary of the project site and runs from southwestern Petaluma across the Petaluma River, bypassing the central district to connect with the Route 101 freeway. South of the development site, "D" Street becomes a county road running to western Marin County and the Pacific coast. At least as early as 1962, "D" Street was described in county planning documents as a "thoroughfare." In current jargon it is characterized as an "arterial" street.

In contrast, "B" is a relatively short residential street. When the original EIR was prepared, the residential portion of "B" carried less than half as much traffic as the parallel segment of "D." However "B" ends right at, or very near, the northern boundary of the project site, whereas "D" at its nearest point is several hundred feet from the site.

In keeping with the designation of "D" as an arterial street and the residential character of "B," the City in 1975 conditioned future development of the property on the provision of access via "D" Street and another arterial, Western Avenue. This required the acquisition of rights of way across the adjoining property. In May 1978, the proponents asked to be relieved of this requirement. The response is not found in the record, but it may be inferred that a compromise was reached whereby the initial stages of the project would use "B" alone, subject to the understanding that access to "D" and Western would be required at a later stage of the project.

At any rate, the proposal as analyzed in the original EIR employed four streets. Primary access, provided in the first phase of the project, would be on "B" Street and Hayes Avenue. In a later phase, the site would be

connected to Western Avenue and "D" Street. The impact of the project was analyzed under two alternative hypotheses: First, that traffic would enter and exit on "B" and Hayes alone; second, that all four streets would be used for access. With access on "B" and Hayes only, traffic on "B" would more than double; traffic on Hayes would increase by 38 percent; and traffic on "D" would show an increase (at the most heavily affected location) of 16.4 percent. Providing access on all four streets would reduce somewhat the impact on "B" and Hayes while increasing the impact on "D" by an additional 4 percent.

Some two years after certification of the EIR, the planning department made a "request" that Daon acquire access to "D" and Western "prior to proceeding with a zoning-development plan." The City staff considered access via these arterials a primary mitigating measure to be incorporated in the proposal. Daon apparently experienced considerable difficulty complying with this request.[11] However, Daon finally secured an option for an easement to "D" Street in conformance with the City's conditions and requests.

By June 1983 the proposal had been reconfigured to reflect, among other things, the new provisions for access. At the department's request, an updated traffic study was prepared. As reviewed in that "traffic update," and as ultimately approved, the project included a new street, Victoria Drive, which passed through the site and connected Western Avenue to "D" Street. Hayes Avenue would be extended into the northeastern portion of the site where it would provide access for the project's fifty apartments. No automobile access to "B" Street was provided.

The traffic update projected that 2,870 daily trips would be generated by the 307 units.[12] On the most heavily affected portion of "D" Street, daily traffic was projected to increase by 1,740 trips, or 29 percent, while peak hour traffic would increase by 170 trips, or 32.4 percent. Traffic on "B," on the other hand, would increase by only 100 trips per day instead of the 1,435 trips projected under the original plan. The update concluded that

---

[11]The original developer said that it "could not afford" to acquire the rights of way. Two years later Daon was attempting to acquire them, but even though the project could not proceed without these rights of way, two more years passed before they were secured. The terms of the agreement for a right of way to "D" Street seem highly favorable to the grantor, presumably reflecting his considerable bargaining leverage: Daon agreed to pay $125,000 for the easement plus an additional $35,000 supposedly to compensate for "anticipated noise" to be suffered by the seller, and to construct or supply a number of improvements on or to the seller's property.

[12]The final conditions of approval resulted in six fewer single-family homes than were in the proposal as analyzed in the traffic update. Under the formula applied in the traffic update, this would reduce the projected total traffic impact by 60 daily trips, or 2.1 percent.

the project "would not significantly affect traffic operations on the adjacent street network," although at specified locations "existing operational problems would be exacerbated."[13]

The update also used a method of analysis not employed in the original traffic study. The methodology, known as traffic infusion on residential environment (TIRE), assigned a numerical value to "residents' perception of traffic effects on activities such as walking, crossing the street and maneuvering out of a driveway." The update calculated that the TIRE index would increase by 0.1 points at all three locations on "D" Street. Under the TIRE methodology, "a change of 0.1 or more would be noticeable to street residents."

After a notice to the public, a planning commission meeting was held on August 23, 1983, to consider, among other things, whether or not the existing EIR with updated data satisfactorily described the project's environmental effects and possible mitigation measures. On the recommendation of planning department staff, "to permit the public sufficient time to better review the project and update reports," no action was taken pending a further meeting in September. Questions asked by members of the public at the August 23 meeting were taken down and responded to by the developer, city engineer, and planning department staff. At the continued hearing on September 27, these questions and comments were reviewed and further public comments were taken. After a further hearing on January 24, 1984, the planning commission voted to approve the tentative map and rezoning with numerous conditions. The city council voted likewise after a prolonged public session, also passing a resolution "incorporating" the traffic and other updates as "addenda" to the previously certified EIR.

## IV.

◼ The trial court concluded that a subsequent or supplemental EIR was necessary to address the issues of traffic-related noise and the "traffic impact itself." The latter phrase referred to the court's mistaken belief that the original EIR indicated a traffic increase of only 1,000 daily trips while the traffic update projected 2,870 trips. In fact both reports projected identical increases of 2,870 trips for the project as a whole; the difference was the distribution of those trips over the surrounding streets. It is unclear whether the court believed the 2,870 figure referred to the impact on all streets (which it did) or that on "D" Street alone, but it was evidently under

---

[13]To mitigate the project's impact at these existing problem locations, the City's approval of the project was conditioned on Daon's contributing to various street improvements in an amount proportionate to the project's share of traffic burdening the affected streets.

one of two (equally mistaken) impressions: Either that the impact of the revised plan on "D" Street would be an increase of 2,870 trips (41 percent), or that the shift of access to "D" Street would somehow increase the overall impact of the project by 1,865 trips.

In fact the record contains ample evidence to support the determination that elimination of direct access to "B" Street, with the resulting increase of traffic on "D" Street, was not a substantial change in the plan requiring major revisions to the EIR. Access to "D" was contemplated from the very beginning of the project and was assumed in the analysis adopted by the original EIR. It was clear that the project would have an impact on "D" regardless of the approach taken. The portion of "D" most heavily affected under the plan as ultimately approved (i.e., north of El Rose) would have experienced an increase of at least 575 daily trips, and as many as 715, under the original plan. Therefore given the projected total impact of 1,740 trips from the revised proposal, the effect of the revisions was to increase traffic flow on "D" by 1,040 daily trips, or 17.3 percent. The conclusions reached in the traffic update were substantially identical to those of the original EIR, namely, that the project would not result in significant degradation of the surrounding street network. We discern nothing in this evidence, or anywhere else in the record, which compels the conclusion that the revisions were "substantial."

As for the project's impact on traffic-related noise, the trial court noted three isolated features of the record: (1) An initial recommendation by the planning department staff that a "noise mitigation fund" be created to reimburse neighborhood residents for installing noise abatement features in their homes; (2) Daon's payment of $35,000 as compensation for noise in connection with the easement to "D" Street; and (3) the existence of "substantial public concern" about increases in noise.

The trial court made no attempt to distinguish between noise effects attributable to the project as a whole and those caused by project revisions. The question under section 21166 is whether substantial *changes* have taken place. Nothing in the record suggests that the modifications to the proposal are responsible for any supposed noise problem.

The original EIR analyzed the noise expected from the project. It found the increase "nominal" and concluded that "the probability of high noise levels near sensitive residential receptors is very low, and does not warrant the installation of physical noise barriers or soundproofing as mitigation actions." There is no basis for supposing that the shift of 1,000 daily automobile trips from residential "B" Street to arterial "D" Street altered this analysis in any way. Indeed according to the traffic update, "traffic

increases on low volume streets will be more readily recognized by adjacent residents." This obvious point—that a given increase in traffic has less effect on a more heavily travelled street like "D" than on a lightly traveled one like "B"—supports the City's belief that shifting traffic from "B" to "D" would operate to *reduce* the project's impact, including its impact on neighborhood noise.

A review of the entire record reveals a wealth of evidence establishing that, even viewed as a whole, this project would not have a significant noise impact. The fact that some staff members initially favored the "unusual" measure of a "noise mitigation fund" hardly establishes that a new EIR was necessary. That recommendation was abandoned both because the City did not want to assume responsibility for administering such a program, and because staff members decided the noise problems reported by "D" Street residents could not be fairly attributed to the Daon proposal and a contribution reflecting Daon's fair share of traffic impact would be too small to do any good.

The planning director said that the number of vehicles must double before increases in traffic cause a significant increase in noise. The projected traffic increase on "D" Street does not approach that level. The planning director also noted that the primary factor in noise levels is the amount of truck traffic. It appears that "D" already carried a substantial amount of truck traffic, to which the project would not add significantly. Victoria Drive would not be designed to handle trucks, and if it began to serve as a truck bypass between Western and "D" the city council was inclined to ban such use. Another major factor in traffic noise—the street surface—would actually be *improved* under one of the mitigating measures to be financed in significant part by Daon, i.e., the resurfacing of the segments of "D" most heavily affected. Planning department staff indicated that this measure would reduce road noise.

Daon's payment of $35,000 as "compensation" to the adjoining landowner for anticipated noise does not establish that the changes to the project were substantial or that major revisions to the EIR were required. Daon's representative stated that this money "was part of the overall negotiation" for the right-of-way connecting the project site to "D" Street and that "it wasn't really for the noise." Moreover the impact on a landowner of a new road through his property is hardly indicative of the environmental effect which an increase in traffic flow may have on an existing street.

Nor does the existence of public controversy establish that a subsequent EIR was necessary. Such controversy, by itself, will not even require preparation of an *original* EIR. (§ 21082.2, subd. (a); *Friends of "B" Street,*

*supra,* 106 Cal.App.3d at p. 1002; *Running Fence Corp.* v. *Superior Court* (1975) 51 Cal.App.3d 400, 424 [124 Cal.Rptr. 339].) The public comments concerning noise established only that "D" Street already experienced noise levels to which residents objected and that there was considerable concern about the effects of its "arterial" status.

■ Objectors argue that the modifications involved here were more than "minor technical changes" and that therefore the use of an "addendum" was not proper under Guideline 15164.[14] The question, however, is not whether an addendum was authorized but whether a supplemental EIR was required. Section 21166 provides that a subsequent EIR shall not be required *unless* "substantial changes" necessitating "major revisions" are shown. To the extent the Guidelines are inconsistent with or purport to alter this standard, they must yield to the authority from which they flow. (See § 21083 [authorizing Office of Planning and Research to develop guidelines including criteria for evaluating projects "in a manner consistent with this division"]; *Miller* v. *Woods* (1983) 148 Cal.App.3d 862, 876 [196 Cal.Rptr. 69]; *Blumenfeld* v. *San Francisco Bay Conservation Etc. Com.* (1974) 43 Cal.App.3d 50, 57 [117 Cal.Rptr. 327] [regulation which alters statute or impairs its scope should be invalidated].) However the Guidelines themselves require a subsequent EIR only when proposed modifications "will require important revisions of the previous EIR." (Guideline 15162.)[15] If a lacuna exists

---

[14]Guideline 15164, subdivision (a), provides: "[¶] The lead agency or a responsible agency shall prepare an addendum to an EIR if: [¶] (1) None of the conditions described in Section 15162 [see fn. 15] calling for preparation of a subsequent EIR have occurred; [¶] (2) Only minor technical changes or additions are necessary to make the EIR under consideration adequate under CEQA; and [¶] (3) The changes to the EIR made by the addendum do not raise important new issues about the significant effects on the environment."

[15]Guideline 15162, subdivision (a), provides: "[¶] Where an EIR or negative declaration has been prepared, no additional EIR need be prepared unless:

"(1) Subsequent changes are proposed in the project which will require important revisions of the previous EIR or negative declaration due to the involvement of new significant environmental impacts not considered in a previous EIR or negative declaration on the project;

"(2) Substantial changes occur with respect to the circumstances under which the project is undertaken, such as a substantial deterioration in the air quality where the project will be located, which will require important revisions in the previous EIR or negative declaration due to the involvement of new significant environmental impacts not covered in a previous EIR or negative declaration; or

"(3) New information of substantial importance to the project becomes available, and

"(A) The information was not known and could not have been known at the time the previous EIR was certified as complete or the negative declaration was adopted, and

"(B) The new information shows any of the following:

"1. The project will have one or more significant effects not discussed previously in the EIR;

"2. Significant effects previously examined will be substantially more severe than shown in the EIR;

"3. Mitigation measures or alternatives previously found not to be feasible would in fact

between this provision and Guideline 15164, the City may fashion appropriate procedures to fill the gap.

### V.

Objectors suggest that the judgment should be affirmed because of other alleged inadequacies in the environmental review. None of these supposed flaws in the proceedings arose from the project modifications; the criticisms are equally applicable to the original EIR, which stood unchallenged for nearly five years before the present action was filed. Since we find these objections to be without merit, however, and since no affirmative defenses have been pressed by Daon, we do not consider whether objectors are precluded from raising these points.

█ Objectors contend that the EIR should have addressed the project's impact on the "historical qualities of 'D' Street." They assert that the "D" Street neighborhood possesses a "unique historical character" which may be adversely affected by the Sonoma Highlands project. The cited portions of the record do not support this assertion. In the first place it was never established on the administrative record that the neighborhood *has* a historic character.[16] The record contains only general statements to that effect unsupported by specific information of any kind. One witness apparently based her opinion on a reference to "historic 'D' Street" in a real estate listing. Another asserted that the "unique" qualities of the area were "acknowledged" in a study conducted by the City in 1978 or 1979. The study was neither identified nor placed in the record. No other witness gave any basis at all for a belief in the neighborhood's supposed historical qualities. Moreover, even assuming that the neighborhood possesses historic value, nothing in this record would justify a determination that this project or its modifications would adversely affect those qualities.

█ Next objectors contend that the City should have given greater consideration to the cumulative impacts of the project. The original EIR addressed this subject. No deficiencies in that analysis are specified, and no attempt is made to isolate any new cumulative impact resulting from the modifications to the project. Objectors' contention is really a thinly disguised attack on the City's policy decision to permit development on the west side

---

be feasible and would substantially reduce one or more significant effects of the project; or

"4. Mitigation measures or alternatives which were not previously considered in the EIR would substantially lessen one or more significant effects on the environment."

[16]In the trial court, objectors filed with their reply papers copies of a book concerning Petaluma's "architectural heritage." The trial court admitted no evidence beyond the administrative record, and so presumably did not consider the book. Objectors have not relied on the book here, and we decline to consider, on our own motion, whether it was admissible.

of Petaluma. It is not our role on this appeal to determine the substantive correctness of that decision.

■ Finally objectors assert that greater consideration should have been given to "feasible alternatives," specifically the construction of a "ring road" to draw traffic away from "D" Street. Daon does not address this contention in its brief,[17] but argued below that the ring road was not a feasible alternative and therefore need not have been discussed in the EIR.

A "ring road" in the general vicinity of the project site was part of the City's 1962 general plan. Various members of the public expressed the view that construction of the ring road would reduce traffic on "D" Street. Mr. Freitas of the planning department said during the city council meeting that given the limited growth in the area, "we do not have enough capacity shown in our area to give serious consideration to that [a ring road] at this time." He also said that the idea of a ring road had been looked at in "some early plans," but that "they were not adopted for the western side," that the present 300-unit subdivision would not justify the public or private expense of such a road, and that the matter could be revisited in a larger context in the City's next review of its environmental design plan. However, there was no formal analysis of the "ring road" in the EIR or the traffic update.

■ An environmental impact report must identify proposed mitigation measures as well as alternatives to the proposed project. (§ 21100, subds. (c), (d).) However, CEQA does not require analysis of every *imaginable* alternative or mitigation measure; its concern is with *feasible* means of reducing environmental effects. Section 21002 states in part that the intention of CEQA is "to assist public agencies in systematically identifying both the significant effects of proposed projects and the *feasible* alternatives or *feasible* mitigation measures which will avoid or substantially lessen such significant effects."

"Feasible" is defined as "capable of being accomplished in a successful manner within a reasonable period of time, taking into account economic, environmental, social, and technological factors." (§ 21061.1.) "The statute does not demand what is not realistically possible, given the limitation of time, energy and funds." (*Foundation for San Francisco's Architectural Heritage* v. *City and County of San Francisco* (1980) 106 Cal.App.3d 893,

---

[17]Daon argues that we should disregard questions which were not addressed in the trial court's opinion. This overlooks the rule that we review the trial court's actions, not its reasons. (9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 259, pp. 266-267.) We must consider objectors' arguments in order to determine whether the *judgment* is sustainable on any basis properly before us. (*Ibid.*)

910 [165 Cal.Rptr. 401].) Instead the requirement that the EIR identify alternatives and mitigating measures "must be judged against a rule of reason. There is no need for the EIR to consider an alternative whose effect cannot be reasonably ascertained and whose implementation is deemed remote and speculative [citations]." (*Ibid.*; see *Residents Ad Hoc Stadium Com.* v. *Board of Trustees* (1979) 89 Cal.App.3d 274, 286-287 [152 Cal.Rptr. 585].)

 Certainly the EIR would have been more comprehensive had it contained a discussion of the ring road idea. Before we can find an abuse of discretion, however, more than that must be shown. It is obvious that had Daon's project been conditioned on completion of a ring road it would have suffered years of additional delay while the road was designed, designs were approved, rights of way were secured by purchase or eminent domain, an independent environmental review was pursued to completion, and the road was finally built. The City was justified in concluding that this indisputable added delay made it infeasible to include the ring road as a condition of this project, given the size of the project and the limited magnitude of its environmental effects. The failure to explicitly include that analysis in the EIR may have rendered the document imperfect, but "[a]bsolute perfection is not required; what is required is the production of information sufficient to permit a reasonable choice of alternatives so far as environmental aspects are concerned. It is only required that the officials and agencies make an objective, good-faith effort to comply." (*Foundation for San Francisco's Architectural Heritage, supra,* 106 Cal.App.3d at p. 910; see *Mount Sutro Defense Committee* v. *Regents of University of California* (1978) 77 Cal.App.3d 20, 37 [143 Cal.Rptr. 365].)

The trial court remarked that it "in no way question[ed] respondent's good faith." Since the whole basis for setting aside the City's actions was the erroneous rule of decision applied by the court, and since we discern no other basis for affirmance, the judgment must be reversed.

## VI.

 The trial court granted objectors' motion for an award of attorneys fees.[18] The motion was made on the ground that objectors' prosecution of

---

[18]The order awarding fees was made after entry of judgment and therefore is not reviewable on appeal from the judgment alone. (*Taylor* v. *McKay* (1975) 53 Cal.App.3d 644, 653 [126 Cal.Rptr. 204]; 9 Witkin, *op. cit. supra,* § 252, pp. 258-259.) Daon's notice of appeal steered clear of this obstacle by making specific reference to the minute order awarding fees. Presumably the minute order was appealable despite the trial court's entry of a formal order after the notice of appeal was filed. (See 9 Witkin, *op. cit. supra,* §§ 91, 402-407, pp. 112-113, 397-402; Cal. Rules of Court, rule 2(b)(2).) We need not decide this question, however, for even if the appeal from the minute order were premature we would treat it as timely. (See 9 Witkin, *op. cit. supra,* §§ 412-415, pp. 410-413; Cal. Rules of Court, rule 2(c).)

the action had conferred a substantial benefit on the residents of Petaluma. Daon contends that objectors did not satisfy the conditions for such an award because they did not show that "the necessity and financial burden of private enforcement are such as to make the award appropriate." (Code Civ. Proc., § 1021.5, subd. (b).)

An award of the type made here is available only to "a successful party." (Code Civ. Proc., § 1021.5.) Because we reverse, objectors are not "successful" and are not entitled to fees. (See *Rich* v. *Schwab* (1984) 162 Cal.App.3d 739, 745 [209 Cal.Rptr. 417] [award to "prevailing party" under Civ. Code, § 1942.5, subd. (g)].) Moreover, by analogy to an award of costs, the allowance of fees was incidental to, and therefore falls with, the judgment. (See *Ellis* v. *City Council* (1963) 222 Cal.App.2d 490, 501 [35 Cal.Rptr. 317]; 9 Witkin, *op. cit. supra,* § 625, p. 607.) Accordingly we do not reach the issue raised by Daon.

The judgment is reversed in its entirety and the trial court is directed to enter judgment in favor of the City of Petaluma and City Council of Petaluma.

Costs on appeal to appellant.

Poché, Acting P. J., and Sabraw, J., concurred.