[No. F009398. Fifth Dist. Nov. 1, 1988.]

FRED STONE et al., Plaintiffs and Appellants, v.
BOARD OF SUPERVISORS OF TUOLUMNE COUNTY,
Defendant and Respondent;
SONORA MINING CORPORATION, Real Party in Interest and
Respondent.

COUNSEL

Alexander T. Henson for Plaintiffs and Appellants.

Richard Matranga for Defendant and Respondent.

Ball, Hunt, Hart, Brown & Baerwitz, Charles E. Greenberg, Agnes H. Mulhearn and Albert H. Ebright for Real Party in Interest and Respondent.

OPINION

FRANSON, P. J.—

### STATEMENT OF THE CASE

Appellants own property near the Sonora Mining Corporation (SMC) gold mine in Tuolumne County. They challenge the trial court's denial of their petition for writ of mandate to set aside the decision of the Tuolumne County Board of Supervisors (Board) declaring SMC in compliance with the liability insurance condition of their use permit.

The basic issue before this court is whether the Board's decision constituted a de facto amendment of SMC's use permit thereby requiring a formal amendment and compliance with the California Environmental Quality Act (CEQA).[1] We hold that it does not and affirm the judgment.

### STATEMENT OF FACTS

In 1984 the Board certified an environmental impact report (EIR) and approved a use permit for SMC to mine gold in the Mother Lode area of Tuolumne County. The use permit was subject to certain conditions designed to mitigate the potential adverse environmental effects of the project. Condition 17 stated: "The sponsor agrees to maintain in full force and effect for the entire period of its operations under this permit a policy of liability insurance acceptable to the County in the amount of at least $40,000,000.00. Such policy shall provide that none of its terms may be altered, cancelled or amended without 30 days prior written notice to the County. Such policy shall name the County of Tuolumne as an additional insured."

---

[1] Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless otherwise indicated.

SMC implemented the project and constructed the buildings and structures authorized by the use permit. In November 1985, the Board determined that SMC had not secured all governmental approvals necessary for the ultimate project as required by condition 20 of the use permit and directed SMC to apply for an amendment to the permit, which would be subject to CEQA review.

SMC applied for an amendment to the use permit and for a zoning change necessitated by the amendment. The director of the Tuolumne County Planning Department prepared a draft supplemental EIR in connection with the application. Following the requisite public comment period and receipt of comments and written responses to comments in June 1986, the Board certified the final supplemental EIR, and approved the zone change and the amended use permit. A number of the original conditions were changed in the amended use permit. Condition 17 in the 1986 use permit provided: "The sponsor agrees to maintain in full force and effect for the entire period of its operations under this permit a policy of liability insurance or other security acceptable to the County in an amount of at least $25,000,000.00. Such policy shall name the County of Tuolumne as an additional insured."

The amendment to condition 17 reflected an earlier staff opinion that $25 million was sufficient liability coverage. The original $40 million figure came about because neighboring homeowners insisted on the higher figure.

In November 1986, SMC added a $3 million environmental pollution liability insurance policy. This policy was required by the California Regional Water Quality Control Board as a condition to SMC's waste discharge permit from the state.

In December 1986, the Board received copies of the certificates of insurance on the new policies which raised questions as to SMC's liability coverage. Deputy County Counsel Faulstich analyzed the multiple layers of coverage and determined that the $25 million policy contained pollution liability exclusions; however, there was a separate policy with $3 million coverage for pollution liability.

SMC met with Tuolumne County (County) representatives in February 1987 and agreed to pay the cost (approximately $33,000 per year) of hiring a county planner to monitor the company's compliance with the conditions specified in the use permit and to reimburse the County up to $10,000 per year for experts who might be required to assist the planner in monitoring compliance. The Board also directed SMC to investigate the feasibility of securing additional pollution liability insurance.

In April 1987, SMC reported that it could secure up to $12.5 million in pollution coverage but at a cost of over $300,000 per year. Planning Director James Nuzum opined that the Board had two options. First, it could determine that SMC had obtained as much pollution insurance coverage as was reasonably available and that coverage, along with the hiring of the environmental monitor, was an alternative form of security acceptable to the County. Second, the Board could require SMC to obtain additional pollution insurance up to $12.5 million.

County counsel was of the view that under the terms of the use permit condition, SMC was required to obtain the full $12.5 million pollution insurance available. Only if it was impossible for SMC to obtain it, could SMC be allowed to substitute monitoring, funding of experts or other forms of security acceptable to the County. In the alternative, SMC could seek a use permit amendment.

At the Board meeting on May 5, 1987, appellants argued that SMC was not in compliance because condition 17 required $25 million of insurance for all risks including pollution liability. After extensive discussion, the Board found SMC in compliance. The $3 million pollution liability coverage was adequate so long as SMC continued to fund the environmental monitor as additional security to prevent contamination of the environment.

## DISCUSSION

*Standard of Review*

Review of decisions made pursuant to CEQA or its administrative guidelines is governed by sections 21168 and 21168.5, the provisions of which focus review on "(1) whether there is any substantial evidence in light of the whole record to support the decision; and (2) whether the agency making the decision abused its discretion by failing to proceed in the manner required by law." (*Dehne* v. *County of Santa Clara* (1981) 115 Cal.App.3d 827, 835 [171 Cal.Rptr. 753].) ■ The reviewing court may not substitute its judgment for that of the local agency as to what constitutes wise public policy. (*El Dorado Union High School Dist.* v. *City of Placerville* (1983) 144 Cal.App.3d 123, 130 [192 Cal.Rptr. 480].)

■ On appeal, appellants argue that the Board's action constituted a substantial change in the use permit condition requiring a formal permit amendment and compliance with CEQA review procedures. Accordingly, this court must determine (1) whether there is substantial evidence to sup-

port the Board's decision to find SMC in compliance with condition 17 and (2) whether the Board proceeded in the manner required by law.

 I. *Substantial evidence supports the Board's decision that SMC was in compliance with condition 17 of the use permit.*

*Long-term Pollution Liability Insurance*

 ▮▮▮ Appellants assert the Board changed condition 17 under the guise of interpreting it by accepting only $3 million of pollution coverage as compliance when $25 million was required.

 Appellants' argument assumes that the 1984 and 1986 use permit insurance conditions required long-term pollution liability coverage. On their face, however, the conditions merely call for general liability insurance of a specified amount; they do not specify the risks to be covered.

 The administrative record of the 1984 Board proceedings discloses that the Board was advised that the policies which SMC provided at the beginning of its operations did not cover off-site damage caused by blasting, chemical pollution of ground water and air pollution. As to the new policies to be provided, the Board was told that SMC would provide "comprehensive general liability insurance" for off-site property damage caused by mining operations "subject to standard exclusions and conditions." The record does not specify the exclusions or conditions. On the basis of the record, the trial court concluded that appellants' contention that pollution insurance was required under the 1984 permit was erroneous.

 ▮▮▮ The trial court's finding was reasonable. There is a rebuttable presumption affecting the burden of proof—that official duty has been regularly performed. (Evid. Code, § 664.) The effect of this presumption is to place upon the party against whom it operates the burden of proving the nonexistence of the presumed fact. (Evid. Code, § 606.) Here, the presumed fact is that the Board understood the terms and conditions of the policies it accepted in 1984 as satisfying condition 17—that the comprehensive general liability policy subject to "standard exclusions" did not cover long-term environmental pollution risks. Thus, appellants have failed to meet their burden of proving the contrary fact, i.e., the Board intended and SMC understood it was to provide long-term pollution coverage under the 1984 use permit.

 The same presumption of official regularity applies to the 1986 liability insurance condition. The record does not show the $25 million coverage was intended to cover long-term pollution liability. The $3 million long-term pollution policy was provided in 1986, not because it was required

under permit condition 17, but because it was required by the state Water Quality Control Board as a condition to SMC obtaining a waste discharge permit from the state.

■ As condition 17 did not require long-term pollution liability coverage, the Board's action of accepting a $3 million policy did not effect a change in the permit condition.

*Sudden-impact Pollution Liability Insurance*

The 1984 policy which the Board accepted as compliance with the permit condition covered sudden-impact pollution liability up to $40 million. The $25 million policy in effect in 1987 excluded pollution liability, but the additional $3 million policy covered both sudden and long-term pollution damages. At the May 5, 1987, meeting, the Board concluded the two insurance policies and the on-site environmental monitor met the condition 17 criteria.

■ Appellants contend the Board's interpretation of the condition 17 language actually amended the condition. They ask this court to determine the permissible range between permit language and assessed compliance, and to set out the criteria by which the assessment is to be measured. They suggest the standard to be whether the purported compliance will create new or more severe environmental impacts. If so, the assessed compliance is truly a de facto amendment of the use permit condition and requires CEQA review procedures.

On the other hand, SMC contends a public agency is empowered to interpret its own use permit conditions under a "reasonableness" standard. (Cf. *Ayres* v. *City Council of Los Angeles* (1949) 34 Cal.2d 31, 42 [207 P.2d 1, 11 A.L.R.2d 503]; *O'Hagen* v. *Board of Zoning Adjustment* (1971) 19 Cal.App.3d 151, 158 [96 Cal.Rptr. 484]; and *Nollan* v. *California Coastal Com'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 687, 107 S.Ct. 3141, 3146].)

Neither the parties nor this court has located dispositive authority governing an agency's power to interpret its own permit having a potential environmental impact consequence. However, *Bowman* v. *City of Petaluma* (1986) 185 Cal.App.3d 1065 [230 Cal.Rptr. 413], by analogy, provides some guidance. In *Bowman,* the court construed section 21166 which prescribes when a subsequent EIR is required. Section 21166 prohibits an agency from requiring a subsequent or supplemental EIR unless: substantial changes are proposed in the project which require major revisions in the EIR, substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the EIR,

or new information, which was not known when the EIR was certified as complete, becomes available.

■ Unlike section 21151[2] which is intended to create a low threshold requirement for preparation of an original EIR, section 21166 indicates an intent to restrict the powers of agencies by prohibiting them from requiring subsequent EIR's unless the stated conditions are met. (Review of Selected 1977 California Legislation (1978) 9 Pacific L.J. 281, 641-644.) Section 21166 comes into play when in-depth review of a project has already occurred (by virtue of the original EIR), and the time for challenging the sufficiency of the original EIR has expired. Under section 21166, the question is whether circumstances have changed enough to justify repeating a substantial portion of the process. The section is intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved. (*Bowman* v. *City of Petaluma, supra,* 185 Cal.App.3d at pp. 1073-1074.)

■ A similar policy should govern the Board's compliance determination in this case where the use permit at issue was subjected to extensive environmental review at earlier CEQA proceedings, and the time for challenging the sufficiency of those proceedings had long since expired.

The appropriate standard by which an agency should assess compliance with a use permit condition lies in a combination of the standards proposed by appellants and respondent. The agency must interpret the conditions it imposes in a reasonable manner, consistent with its intent at the time the condition was enacted. But the agency's interpretation is reasonable in the CEQA context only if it imposes no significant new or adverse environmental impacts. Such a standard would promote the Legislature's expressed concern for balancing environmental considerations against the social and economic burdens of compliance with CEQA mandates.

■ Under the standard, this court must determine whether the Board's interpretation of condition 17 imposed significant new or adverse environmental impacts and was thus unreasonable. By agreeing not to require SMC to secure more pollution insurance, the Board, in effect, interpreted condi-

---

[2] Section 21151 provides: "All local agencies shall prepare, or cause to be prepared by contract, and certify the completion of an environmental impact report on any project they intend to carry out or approve which may have a significant effect on the environment. When a report is required by Section 65402 of the Government Code, the environmental impact report may be submitted as a part of that report.

"For purposes of this section, any significant effect on the environment shall be limited to substantial, or potentially substantial, adverse changes in physical conditions which exist within the area as defined in Section 21060.5."

tion 17's "other security acceptable to the County" to authorize a $3 million pollution liability policy coupled with an on-site environmental monitor. The record demonstrates the Board's interpretation was reasonable.

The $25 million policy in effect in 1987 had much broader pollution exclusions than the earlier policy, but the additional $3 million policy covered both sudden and gradual pollution liability. In addition, in February 1987 at the County's request, SMC agreed to fund the annual salary for a county environmental monitor and outside expert monitoring assistance as additional security to prevent contamination of the environment. Other conditions in the 1986 use permit provide for monitoring of water wells and springs up to one and one-quarter and one and one-half miles from the perimeter of the mining property and for installation of a water pipeline from SMC property to any property whose well or springs were found to be deficient in production or quality of fresh water. All remedial costs were to be paid by SMC. In addition, stringent noise and monitoring standards were required to mitigate noise problems.

The Board also heard evidence from SMC that the $3 million pollution liability coverage figure was arrived at after four independent risk assessments were done to determine the level of risk at the mine site. The maximum cost of implementing measures for cleanup of a spill at the mine was estimated at $2 million. The $3 million amount was the coverage normally required by the United States government for operators of hazardous waste dumps. In addition, SMC reported that it could obtain only $12.5 million in pollution liability coverage. The $3 million policy which SMC secured cost approximately $183,000 a year, and the additional coverage (up to $12.5 million) would cost approximately $206,500 more per year. After entertaining extensive discussion from both sides on the issue, the Board concluded that SMC had complied with condition 17 by securing a $25 million general liability insurance policy, a $3 million pollution liability policy and by agreeing to fund an environmental monitor and other experts who would assess SMC's compliance with the other conditions of the use permit.

Since SMC never had comprehensive pollution liability coverage, the Board's May 5, 1987, act of finding compliance when SMC had not secured the maximum amount of pollution liability insurance then available neither substantially changed the environmental impacts of the 1986 permit nor created adverse environmental effects. The addition of a full-time on-site environmental monitor could be expected to have a positive effect on the environment. And, while SMC had less sudden-impact pollution liability coverage in 1987 than it had in 1984, it had more long-term pollution coverage. Moreover, ample evidence was presented to support the Board's conclusion that the amount of pollution liability insurance (in addition to

the $25 million general liability policy) was adequate in light of the other preventative measures in effect. Accordingly, the Board's interpretation of condition 17 imposed no significant new or adverse environmental impacts and was therefore reasonable.

 Having concluded the Board's determination was reasonable, we also conclude there is substantial evidence to support the Board's decision finding SMC in compliance with condition 17. The Board found, in effect, that the $25 million policy, the $3 million policy and the additional on-site environmental monitor were insurance or "other security acceptable to the County in an amount of at least $25,000,000.00" under condition 17. That finding was supported by substantial evidence in the record (see discussion, *ante*) and fostered the legislative intent behind the CEQA statutes of *preventing* environmental damage (§ 21000, subd. (g)), rather than merely providing indemnity in the event of loss.

II. *The Board proceeded in a lawful manner.*

Appellants' contention that the Board failed to proceed in the manner required by law is based on their argument that the Board's decision constituted a de facto amendment of condition 17 which triggered CEQA review procedures. Since we hold there is substantial evidence to support the Board's decision finding SMC in compliance with condition 17, as the Board reasonably interpreted it, we must also conclude the Board proceeded in the manner required by law. The Board interpreted condition 17; it did not amend it. Therefore, the Board's action did not require formal findings or violate any CEQA review requirement.

The judgment is affirmed. Costs to respondents.

Hamlin, J., and Sarkisian, J.,* concurred.

---

* Assigned by the Chairperson of the Judicial Council.