[No. A114205. First Dist., Div. Three. May 7, 2008.]

MICHAEL MOSS, Plaintiff and Appellant, v.
COUNTY OF HUMBOLDT et al., Defendants and Respondents.

[No. A114622. First Dist., Div. Three. May 7, 2008.]

MICHAEL MOSS, Plaintiff and Respondent, v.
COUNTY OF HUMBOLDT et al., Defendants and Appellants.

COUNSEL

Harland Law Firm, Allison G. Jackson and Richard Smith for Plaintiff and Appellant and for Plaintiff and Respondent.

Tamara C. Falor, County Counsel, and Carolyn J. Ruth, Deputy County Counsel, for Defendants and Respondents and for Defendants and Appellants.

OPINION

McGUINESS, P. J.—These two appeals require us to decide the appropriate level of review under the California Environmental Quality Act (CEQA)[1] for a subdivision project that was initially approved with a mitigated negative declaration but later languished in litigation for so long that its tentative map expired. The Board of Supervisors of the County of Humboldt (County) determined an environmental impact report (EIR) is now required for the subdivision, either because it should be considered as a new project under CEQA or because new information suggests the existence of potential environmental impacts. On a petition for writ of mandate from the landowner, Michael Moss, the trial court rejected the argument that the subdivision is a new project but upheld the County's determination that an EIR is required based on new information about environmental impacts. Moss and the County separately appealed from this judgment, and we consolidated the appeals for decision. We agree with the trial court that the subdivision is not a new project for purposes of CEQA but that supplemental environmental review is required based on new information about certain potentially significant impacts. Because we conclude substantial evidence supports some of the County's findings regarding these impacts, but not others, the judgment is reversed in part and affirmed in part.

## BACKGROUND

On August 16, 1995, Moss submitted an application to the County's planning commission (Planning Commission) proposing to subdivide his parcel of approximately 94 acres into four smaller parcels ranging in size from 20.4 to 33 acres. The site consists of undeveloped, recently harvested timberland, and the project would allow three additional parcels to be developed for agricultural and single-family residential use. The north fork of Luffenholtz Creek runs through the middle of the land and would provide the water source for three of the planned parcels. This tributary flows into the

---

[1] Public Resources Code section 21000 et seq. All statutory references are to the Public Resources Code unless otherwise stated.

much larger main fork of Luffenholtz Creek at the south end of the property. Luffenholtz Creek supplies the water for the City of Trinidad, which is located downstream. Water for the fourth parcel would be provided by Deadman Creek.

After extensive study and public hearings, on November 20, 1997, the Planning Commission approved a tentative subdivision map and adopted a mitigated negative declaration finding that the project's environmental impacts were either insignificant or would be mitigated to a level of insignificance. Several findings in the 1997 mitigated negative declaration are of particular note. First, planning staff found that although the project would reduce the surface water in Luffenholtz Creek "slightly," it would not cause a substantial reduction in the amount of water available for supplying the City of Trinidad. An engineering study conducted in January 1995 estimated that, based upon peak usage, 228 additional hookups could be supplied by the flows of Luffenholtz Creek even in a dry year. Assuming each parcel of the proposed subdivision of the Moss property consumed a full hookup of water, 224 hookups would remain available for Trinidad, thus allowing approximately a 74 percent increase over the current number of water users. In addition, approval of the project was conditioned upon improvements to Adams Fox Farm Road and the implementation of fire safety requirements, which led the County's planning staff to find that the project would have a "positive effect upon fire protection services." Moss was also required to undertake erosion control measures and establish streamside setbacks of 100 feet to avoid any impact to the creeks. With these setbacks, planning staff found that the project would result in no impact to wetland habitats or to wildlife dispersal or migration corridors. Staff observed that previous timber harvests on the property were more damaging to wildlife than the addition of four single-family residences would be.

A citizens group called the Friends of Westhaven and Trinidad appealed the Planning Commission's approval to the County's board of supervisors (Board of Supervisors or Board), but the Board rejected the appeal as untimely. The group's petition for mandamus was denied by the trial court, and we affirmed this ruling on appeal. (*Friends of Westhaven & Trinidad v. County of Humboldt* (Jan. 31, 2000, A085022) [nonpub. opn.].)

Meanwhile, in November 1999, approval of the tentative map for the Moss subdivision expired. (*Friends of Westhaven & Trinidad v. County of Humboldt* (2003) 107 Cal.App.4th 878, 883 [132 Cal.Rptr.2d 561] (*Friends*); see Gov. Code, § 66463.5, subd. (a) ["an approved or conditionally approved tentative map shall expire 24 months after its approval or conditional approval . . ."].)

On August 8, 2000, Moss sought to stay expiration of the tentative map during the period it was subject to litigation. (*Friends*, *supra*, 107 Cal.App.4th at p. 881; see Gov. Code, § 66463.5, subd. (e) [allowing stay of expiration period during pendency of a lawsuit challenging approval or conditional approval of tentative map].) The Board of Supervisors granted Moss's request, and the citizens group challenged its decision in a petition for writ of mandate. (*Friends*, *supra*, 107 Cal.App.4th at p. 881.) The trial court denied the petition; however, we reversed on appeal, concluding the Board of Supervisors had no power to stay expiration of the tentative map after the map had already expired. (*Id.* at pp. 881, 883–885.) Because Moss's application for a stay was made four months after the litigation ended and nine months after the tentative map expired pursuant to Government Code section 66463.5, subdivision (a), we concluded it was untimely and thus should not have been granted. (*Friends, supra,* 107 Cal.App.4th at pp. 885–887.)

On January 5, 2004, Moss filed a new application with the County's Planning Commission for approval of the same tentative map that had previously expired. Based on the belief that the new application represented "a new project" requiring "full CEQA review," planning staff conducted an initial study and this time determined that an EIR would be required before Moss could proceed with the project. Moss appealed this decision to the Board of Supervisors, but he was unsuccessful. On August 16, 2005, the Board approved resolutions affirming the Planning Director's decision on two alternative grounds. In resolution No. 05-55, the Board concluded an EIR was required because the 2004 initial study—which treated the subdivision as a "new" project for CEQA purposes—presented a fair argument of potential adverse environmental impacts. The Board adopted several findings from the initial study concerning potential impacts to agricultural and biological resources, geology, fire safety, hydrology and water quality, land use and planning, public services and transportation. In its alternative finding, resolution No. 05-56, the Board observed a mitigated negative declaration had been prepared for the project in 1997 but determined additional CEQA review was required based on its receipt of new information of substantial importance. Specifically, this information consisted of (1) evidence from the water commissioner of the City of Trinidad about the city's increased water usage, the potential firefighting consequences of a water shortage, and potential impacts of the project on the city's water quality; and (2) evidence that the mapped habitat area for coho salmon, a threatened species, includes Luffenholtz Creek and that the main fork of the creek is a habitat for coastal cutthroat trout, a species of special concern.

Moss filed a petition for writ of mandate challenging the Board's decision. After a hearing on the merits, the trial court found that the Moss subdivision is a "previously approved" project, not a "new" project, for purposes of

CEQA review. However, the court found substantial evidence supported the Board's alternative finding that an EIR is required based on the existence of significant environmental effects not previously considered or more severe effects than were previously considered. Accordingly, the court denied the petition for writ of mandate. After Moss objected to the proposed order of judgment, the trial court issued an order clarifying that *only* those issues discussed by the Board in resolution No. 05-56 are required to be addressed in the EIR.

Moss has appealed from the court's decision that an EIR is required based on evidence of new or different significant impacts, and the County has filed a separate appeal challenging the court's ruling that the subdivision is not a "new" project requiring full CEQA review.[2]

## DISCUSSION

### I. *Levels of Review Under CEQA*

 When a local agency considers the environmental effects of a proposed project, CEQA provides three options. The agency must prepare and certify the completion of an EIR if the project "*may* have a significant effect on the environment." (§ 21151, subd. (a), italics added.) If the agency determines the project will not have a significant effect on the environment, it must prepare a negative declaration to that effect. (§ 21080, subd. (c)(1); Cal. Code Regs., tit. 14, § 15064, subd. (f)(3).)[3] Finally, if the project has potentially significant environmental effects but these effects will be reduced to insignificance by mitigation measures that the project's proponent has agreed to undertake, CEQA requires the local agency to prepare a mitigated negative declaration. (§ 21080, subd. (c)(2); Guidelines, § 15064, subd. (f)(2).)[4]

---

[2] The County has not appealed from the trial court's order after judgment clarifying that the scope of the required EIR is limited to issues discussed in resolution No. 05-56. Full CEQA review of all environmental impacts would have been required, however, if the County had succeeded in its claim that the project is "new."

[3] All references to "Guidelines" are to the state CEQA Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.). Although the Supreme Court "has not decided the issue of whether the Guidelines are regulatory mandates or only aids to interpreting CEQA," the court has observed that, "[a]t a minimum, . . . courts should afford great weight to the Guidelines except when a provision is clearly unauthorized or erroneous under CEQA. [Citation.]" (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 391, fn. 2 [253 Cal.Rptr. 426, 764 P.2d 278].)

[4] Specifically, the statute allows the use of a mitigated negative declaration when "[a]n initial study identifies potentially significant effects on the environment, but (A) revisions in the project plans or proposals made by, or agreed to by, the applicant before the proposed negative declaration and initial study are released for public review would avoid the effects or mitigate the effects to a point where clearly no significant effect on the environment would

■ Determination of whether an EIR is required when a project is first reviewed depends upon the "fair argument" test. (See *Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1016–1017 [100 Cal.Rptr.2d 413]; *Sierra Club v. County of Sonoma* (1992) 6 Cal.App.4th 1307, 1316 [8 Cal.Rptr.2d 473].) "The 'fair argument' test is derived from section 21151, which requires an EIR on any project which 'may have a significant effect on the environment.' That section mandates preparation of an EIR in the first instance 'whenever it can be fairly argued on the basis of substantial evidence that the project may have significant environmental impact.' [Citation.] If there is substantial evidence of such impact, contrary evidence is not adequate to support a decision to dispense with an EIR. [Citations.] Section 21151 creates a low threshold requirement for initial preparation of an EIR and reflects a preference for resolving doubts in favor of environmental review when the question is whether any such review is warranted. [Citations.] For example, if there is a disagreement among experts over the significance of an effect, the agency is to treat the effect as significant and prepare an EIR. [Citations.]" (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at pp. 1316–1317.)

■ The test is markedly different, however, if a project is evaluated after an initial environmental review has occurred. "[A]fter an EIR has been prepared for a project, section 21166 prohibits agencies from requiring a subsequent or supplemental EIR unless '[s]ubstantial changes' are proposed in the project or in its circumstances which will require 'major revisions' in the EIR, or unless certain new information becomes available. (See also Guidelines, § 15162.)" (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1317, fn. omitted.) "Although the statute speaks only in terms of the EIR, CEQA Guidelines apply section 21166 to project changes following an agency's adoption of a negative declaration or a mitigated negative declaration as well as an EIR, and this interpretation has been upheld. (Guidelines, § 15162[, subd. (b)]; *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477–1481 [277 Cal.Rptr. 481] (*Benton*).)" (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1062, 1071–1072 [52 Cal.Rptr.3d 312] (*American Canyon*); see also *Save Our Neighborhood v. Lishman* (2006) 140 Cal.App.4th 1288, 1295–1301 [45 Cal.Rptr.3d 306] (*Save Our Neighborhood*) [applying section 21166 to further review of a project for which a mitigated negative declaration had previously been adopted].)

■ Accordingly, after a project has been subjected to environmental review, the statutory presumption flips in favor of the developer and against

occur, and (B) there is no substantial evidence, in light of the whole record before the lead agency, that the project, as revised, may have a significant effect on the environment." (§ 21080, subd. (c)(2).)

further review. Whereas "[t]he question addressed by section 21151 is whether *any* environmental review is warranted" (*Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073 [230 Cal.Rptr. 413]) "section 21166 comes into play precisely because in-depth review has already occurred, the time for challenging the sufficiency of the original EIR has long since expired [citation], and the question is whether circumstances have *changed* enough to justify *repeating* a substantial portion of the process. Thus, while section 21151 is intended to create a 'low threshold requirement for preparation of an EIR' [citation], section [21166] indicates a quite different intent, namely, to restrict the powers of agencies 'by prohibiting [them] from requiring a subsequent or supplemental environmental impact report' unless the stated conditions are met. [Citation.]" (*Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at pp. 1073–1074.)

In this case, the County asserts further environmental review of the Moss subdivision is required under both section 21151 and section 21166. The distinction is important because if the subdivision is considered a new project for purposes of CEQA, the County may require an EIR based only on a fair argument that the project will have significant biological impacts, and all doubts are to be resolved in favor of allowing such review. (§ 21151; *Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at pp. 1316–1317; *Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at p. 1073; Guidelines, § 15064, subd. (g).)

II. *Resubmitted Application Is Not a New Project*

A. *Standard of Review*

"Generally speaking the question on judicial review of an agency's decision under CEQA is whether the agency abused its discretion. Abuse of discretion in this context means the agency failed to proceed as required by law or there was no substantial evidence to support its decision. Thus in reviewing the adequacy of an EIR the trial court does not determine whether the agency's final determinations were correct but only whether the agency arrived at them in accordance with the law and on the basis of substantial evidence. On appeal we independently review the administrative record under the same standard of review which governs the trial court." (*Lincoln Place Tenants Assn. v. City of Los Angeles* (2005) 130 Cal.App.4th 1491, 1503 [31 Cal.Rptr.3d 353], fns. omitted (*Lincoln Place*); see also §§ 21168, 21168.5; *American Canyon, supra,* 145 Cal.App.4th at p. 1070; *River Valley Preservation Project v. Metropolitan Transit Development Bd.* (1995) 37 Cal.App.4th 154, 168 [43 Cal.Rptr.2d 501]; *Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at pp. 1071–1072.)

Although the standards for judicial review of an agency's decision under sections 21151 and 21166 are well settled, the issue is not so clear with respect to the agency's decision about *which* of these statutes governs the environmental review process. Courts have reached different conclusions about the appropriate level of judicial scrutiny to be applied to an agency's determination about whether a project is "new," such that section 21151 applies, or whether it is a modification of a previously reviewed project, such that section 21166 applies.

In *Save Our Neighborhood, supra,* 140 Cal.App.4th 1288, the Third District Court of Appeal held that this "threshold question [of] whether we are dealing with a change to a particular project or a new project altogether" (*id.* at p. 1301) "is a question of law for the court. [Citation.]" (*Id.* at p. 1297.)[5] Similarly, in considering whether the demolition of an apartment complex was part of a previously reviewed redevelopment project or was itself a new project, Division Seven of the Second District Court of Appeal observed, "The question of what constitutes a 'project' for purposes of CEQA review is a question of law which we review de novo." (*Lincoln Place, supra,* 130 Cal.App.4th at p. 1503, fn. omitted; accord, *Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 637 [10 Cal.Rptr.3d 560]; *Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 984 [28 Cal.Rptr.2d 305]; *Kaufman & Broad-South Bay, Inc. v. Morgan Hill Unified School Dist.* (1992) 9 Cal.App.4th 464, 470 [11 Cal.Rptr.2d 792].)

However, Division Two of the Second District Court of Appeal recently disagreed with this holding of *Save Our Neighborhood.* (*Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1400–1401 [64 Cal.Rptr.3d 79] (*Mani Brothers*).) The *Mani Brothers* court strongly criticized the " 'new project' test" it perceived *Save Our Neighborhood* had employed to determine whether changes in a project required full CEQA review. (*Mani Brothers, supra,* 153 Cal.App.4th at p. 1400.) The court observed: "Drastic changes to a project might be viewed by some as transforming the project to a *new* project, while others may characterize the same drastic changes in a project as resulting in a dramatically *modified*

---

[5] In so holding, the court cited *Benton, supra,* 226 Cal.App.3d at pages 1475, 1477. (*Save Our Neighborhood, supra,* 140 Cal.App.4th at p. 1297.) *Benton* did not specify the standard of review it used in concluding the proposal at issue was a modification of an existing project and not a new project in itself. (See *Benton, supra,* 226 Cal.App.3d at pp. 1475–1477.) However, it is notable that the court did not mention the substantial evidence standard of review until it applied section 21166 and reached the issue of whether evidence of environmental impacts required the preparation of an EIR. (*Benton,* at pp. 1481–1483.)

project. Such labeling entails no specific guidelines and simply is not helpful to our analysis." (*Ibid.*)[6] The court also disagreed with the observation in *Save Our Neighborhood* that it is a question of law whether a project is "new" or is a modification subject to section 21166. (*Mani Brothers, supra,* 153 Cal.App.4th at p. 1400.) Instead, the *Mani Brothers* court believed proper deference to agency decisions in administrative matters requires such decisions to be upheld by the courts so long as they are supported by substantial evidence. (*Ibid.*)

The primary criticism *Mani Brothers* leveled against *Save Our Neighborhood* was that its "question of law" approach would permit courts to decide the appropriate level of environmental review for a modified project without considering the environmental impacts of the modifications. (*Mani Brothers, supra,* 153 Cal.App.4th at p. 1401.) In other words, *Mani Brothers* was particularly concerned about courts drawing their own conclusions about what is essentially a factual question—i.e., whether the effect of changes to a project render it so drastically changed as to constitute a "new" project. The development at issue in *Save Our Neighborhood* was planned for the same land and involved the same mix of uses described in an earlier project; thus, even though the later project had different proponents and was not derived from designs or plans of the earlier project, it arguably imposed no different or greater environmental impacts than had previously been studied. (See *Save Our Neighborhood, supra,* 140 Cal.App.4th at pp. 1291–1292, 1300–1301.)

Unlike the situations in *Save Our Neighborhood* and *Mani Brothers*, the County's argument here does not raise or depend upon any factual assertions about the nature of the project. Moss submitted the same tentative map to the County in 2004 that he had submitted in 1995, and it is undisputed that the proposed subdivision project did not change in any substantial way. The *only* difference is that the 2004 project application does not describe an upgrade to Adams Fox Farm Road, an improvement which the County had required as a condition of the project's approval in 1997. But, as the County recognizes, the reason Moss omitted the road upgrade from his description of the project was that he had already *completed* the upgrade in 2000, with permission and approval from the County. Although the County mentions completion of the road improvements—which it had previously demanded—as a difference of note, the County does not contend this single, minor change is sufficient to justify treatment of the subdivision as an entirely new project. Instead, the

---

[6] *Mani Brothers*'s criticism of the "new project" versus "modified project" distinction strikes us as a bit harsh because, as we have explained, the distinction is inherent in the levels of review set forth in the relevant CEQA provisions. However, we agree with *Mani Brothers* to the extent its discussion meant to suggest that a court should tread with extraordinary care before reversing a local agency's determination about the environmental impact of changes to a project.

County argues all proceedings related to the Moss project "bec[a]me 'void' " or "terminated by operation of law" when the previously approved tentative map for the project expired, and therefore the County was justified in treating the proposal as a new project under CEQA *even though the project itself had not changed in any way.* The legal effect that expiration of a project's tentative map has on CEQA review of the project is not a factual question, nor is it a matter that would typically be within a local agency's realm of expertise. It is a question of law subject to de novo review on appeal. (Cf. *Save Our Carmel River v. Monterey Peninsula Water Management Dist.* (2006) 141 Cal.App.4th 677, 693–694 [46 Cal.Rptr.3d 387] [where an issue turns on interpretation of CEQA provisions or the Guidelines, the appeal presents a question of law subject to de novo review]; *Lincoln Place, supra,* 130 Cal.App.4th at p. 1503 [interpretation of what constitutes a "project" under CEQA is subject to de novo review]; *Bodega Bay Concerned Citizens v. County of Sonoma* (2005) 125 Cal.App.4th 1061, 1069 [23 Cal.Rptr.3d 327] [whether a county has authority to extend expiration of tentative map is a question of law subject to de novo review].)

### B. *Expiration of Tentative Map Did Not Alter the CEQA Project*

In *Friends,* the sole issue before us on appeal was whether the County's Board of Supervisors had authority to approve Moss's request to stay expiration of the tentative map for his project in light of the fact that this request was made nine months after the map had expired pursuant to Government Code section 66463.5, subd. (a). (*Friends, supra,* 107 Cal.App.4th at pp. 881, 883.) Considering only applicable provisions of the Subdivision Map Act (Gov. Code, § 66410 et seq.), and without mentioning a single CEQA provision, we concluded Moss could *not* obtain such a stay after the map had expired. (*Friends, supra,* 107 Cal.App.4th at pp. 883–885.) We noted that "[a] stay prevents expiration from occurring"; therefore, based on the plain meaning of the word, "only an unexpired period can be stayed." (*Id.* at p. 885.) After expiration, we said, "there is nothing left to stay." (*Ibid.*) We also observed that when a tentative map expires, "[t]he developer loses all rights to subdivide pursuant to that map and must start anew." (*Ibid.*)

█ Although our comments were directed only to the continuing vitality of a tentative map after it has expired pursuant to Government Code section 66463.5, subdivision (a), the County lifts them out of this context and insists they stand for the broad proposition that expiration of an approved tentative map extinguishes the development project for purposes of CEQA review as well. Under the view set forth by the County, if the tentative map for a project expires 24 months after its approval or conditional approval (Gov.

Code, § 66463.5, subd. (a)), not only would the developer have to resubmit the map for a new approval, but the environmental effects of the project would have to be reevaluated from scratch, as if no prior CEQA review had occurred. This issue was not before us in *Friends*, and we expressed no opinion on the CEQA consequences of an expired map. (See *County of Ventura v. Channel Islands Marina, Inc.* (2008) 159 Cal.App.4th 615, 626 [71 Cal.Rptr.3d 762] ["A case is not authority for matters not discussed therein."].) It is worth noting, however, that after *Friends* was decided another panel of this division held that a County has authority to extend the expiration date of a tentative map, *even after the map has expired*, so long as an application for an extension was timely filed. (*Bodega Bay Concerned Citizens v. County of Sonoma, supra,* 125 Cal.App.4th at pp. 1069–1072.) This holding undercuts the County's theory that expiration of a tentative map constitutes an irrevocable bar that terminates all proceedings related to the map under both the Subdivision Map Act and CEQA.

Beyond the *Friends* case, which did not address the issue, the County cites no legal authority for its position, and we have found none. *Fund for Environmental Defense v. County of Orange* (1988) 204 Cal.App.3d 1538, 1542–1543 [252 Cal.Rptr. 79] (*Fund*), involved a similar situation, in that after a developer had obtained a use permit for its project, with a certified EIR, the use permit expired. When the developer applied for a new use permit five years later, the county approved it without requiring preparation of a subsequent or supplemental EIR; instead, the county relied on the previous EIR and an addendum. (*Id.* at p. 1543.) Although this decision was challenged by a petition for writ of mandate, no party suggested that expiration of the use permit transformed the proposed development into a new project for CEQA purposes. Rather, the issue on appeal was whether changes in the project and the surrounding circumstances were so substantial that supplemental environmental review was required under section 21166. (*Fund, supra,* 204 Cal.App.3d at pp. 1543–1552.) Similarly, in *Security Environmental Systems, Inc. v. South Coast Air Quality Management Dist.* (1991) 229 Cal.App.3d 110, 117 [280 Cal.Rptr. 108], an air quality management agency approved a negative declaration and issued several conditional permits for construction of a hazardous waste incinerator. When the project's proponent requested an extension of the permits, which were set to expire, the agency imposed several conditions on its approval, including a demand that the proponent prepare an EIR for the project. (*Id.* at pp. 117–119.) Although the court of appeal held the agency had discretion to deny an extension of the permits (*id.* at pp. 119–120), it ruled that, having previously approved a negative declaration for the project, the agency could not now require an EIR unless significant new information justified further CEQA

review under section 21166. (*Security Environmental Systems, Inc. v. South Coast Air Quality Management Dist., supra,* 229 Cal.App.3d at pp. 121–124.)

■ CEQA defines the term "project" broadly as an *activity* that may cause physical changes to the environment. (§ 21065; see also Guidelines, § 15378, subd. (a) [defining "project" as "the whole of an action"].) The Guidelines also explain, "The term 'project' refers to the activity which is being approved and which may be subject to several discretionary approvals by governmental agencies. *The term 'project' does not mean each separate governmental approval.*" (Guidelines, § 15378, subd. (c), italics added; see also *County of Orange v. Superior Court* (2003) 113 Cal.App.4th 1, 9 [6 Cal.Rptr.3d 286]; *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 592 [284 Cal.Rptr. 498].) ■ Thus, it is clear that new government action taken with respect to the same activity for which approval is sought does not convert that activity into a new project for purposes of CEQA review. (See *Committee for a Progressive Gilroy v. State Water Resources Control Bd.* (1987) 192 Cal.App.3d 847, 862–863 [237 Cal.Rptr. 723] [holding water board's reestablishment of discharge requirements for a wastewater treatment plant was merely a government approval of the original project and not a new project under CEQA]; *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 165–166 [217 Cal.Rptr. 893] [holding agency improperly described shopping center development as two projects based on different phases of governmental approval].)

■ A similar situation to the one before us—albeit in reverse—arose in *Lincoln Place, supra,* 130 Cal.App.4th 1491. In 1995, after completion of an EIR, the City of Los Angeles approved a project to redevelop an apartment complex in Venice Beach. (*Id.* at pp. 1495, 1498.) The project was stalled for seven years in litigation, but in 2002 the city concluded the EIR was still sufficient and certified it conditional upon certain mitigation measures. (*Id.* at pp. 1498–1500.) Shortly thereafter, the developers obtained permits for the demolition of five structures without satisfying any of the conditions the city had attached to its approval. (*Id.* at p. 1501.) When these permits were challenged by writ of mandate, the city and the developers maintained that the demolition was a separate project from the redevelopment project. (*Id.* at p. 1507.) Because the city had previously approved a tract map, which was an entitlement to build, the developer asserted the mitigation conditions applied only to the "building" project. (*Ibid.*) This attempt to split the redevelopment into two projects based upon an interpretation of what the city had approved was firmly rejected on appeal, however, based on CEQA's broad definition of "project." (130 Cal.App.4th at p. 1507.) Under CEQA, a project is "the whole

of an action" that has the potential to affect the environment; it is defined based on the activity undertaken and not on actions by governmental entities concerning its approval. (§ 21065; see also Guidelines, § 15378, subds. (a), (c); *Lincoln Place, supra*, 130 Cal.App.4th at p. 1507.)

Based on the broad definition of "project," we conclude expiration of the tentative map did not convert the Moss subdivision into a new project for purposes of CEQA review. Nothing significant about the *activity* to be undertaken on the land has changed in any way; all that has changed is that the County's previous approval of a map expired.[7] Where the environmental impacts of a project have previously been studied, subsequent changes "are meaningful *only* to the extent they affect the environmental impacts of a project." (*Mani Brothers, supra*, 153 Cal.App.4th at p. 1401.) Expiration of the tentative map was an abstract occurrence that had no effect on the project's environmental impacts. Rather, it was the expiration of a discretionary approval by a governmental agency, and the Guidelines make it clear that a CEQA project is not to be defined by each of the discretionary approvals that may be required from government agencies. (Guidelines, § 15378, subd. (c).)[8] The County's argument improperly conflates CEQA with the Subdivision Map Act. These two statutory schemes, although closely related, operate independently. (See *Topanga Assn. for a Scenic Community v. County of Los Angeles* (1989) 214 Cal.App.3d 1348, 1355 [263 Cal.Rptr. 214] [previous elimination of CEQA causes of action did not foreclose a challenge to project's approval under the Subdivision Map Act because this act "provides for environmental impact review *separate from and independent of* the requirements of the CEQA" (italics added)]; cf. *Hunt v. County of Shasta* (1990) 225 Cal.App.3d 432, 444–445 [275 Cal.Rptr. 113] [substantial differences between Subdivision Map Act and CEQA undermined party's argument based on analogy to a CEQA provision].)

Moreover, as a practical matter, the County's position could have potentially absurd and wasteful consequences. If expiration of a tentative map rendered irrelevant all prior environmental review of a project, then mere inadvertence by a developer or local agency in preventing such an expiration

---

[7] The only difference in the activity itself is that Moss has already completed the road improvements the County previously required as a mitigation measure. In light of the far more extensive changes that have been held insufficient to render a project "new" (see, e.g., *American Canyon, supra*, 145 Cal.App.4th at pp. 1072–1073 [change from shopping center to Wal-Mart supercenter]; *Benton, supra*, 226 Cal.App.3d at pp. 1473, 1475–1477 [relocation of winery to new parcel]), this change is not significant.

[8] For the same reason, the fact that the project had achieved only conditional, and not final, approval also does not support the County's decision. A single activity may not be chopped into smaller projects based on different stages of discretionary review by the agency. (Guidelines, § 15378, subd. (c); see, e.g., *County of Orange v. Superior Court, supra*, 113 Cal.App.4th at p. 9.)

could mean that months or years of environmental review—perhaps embodied in an EIR—would have to be ignored and a completely new environmental analysis undertaken. Surely, if the Legislature intended the expiration of a tentative map to have such dramatic consequences, it would have made this intent clear in the Subdivision Map Act or CEQA.

■ Accordingly, the County was incorrect in determining that resubmission of the tentative map converted the Moss subdivision into a new project, subject to full CEQA review. The appropriate question instead is whether supplemental environmental review is required for the project under section 21166. We turn now to the parties' arguments under this statute.

III. *Substantial Evidence Supports Supplemental Review Under Section 21166*

A. *CEQA Requirements and Standard of Review*

Section 21166 states: "When an environmental impact report has been prepared for a project pursuant to this division, no subsequent or supplemental environmental impact report shall be required by the lead agency or by any responsible agency, unless one or more of the following events occurs: [¶] (a) Substantial changes are proposed in the project which will require major revisions of the environmental impact report. [¶] (b) Substantial changes occur with respect to the circumstances under which the project is being undertaken which will require major revisions in the environmental impact report. [¶] (c) New information, which was not known and could not have been known at the time the environmental impact report was certified as complete, becomes available."

■ "Section 21166 is intended to provide a balance against the burdens created by the environmental review process and to accord a reasonable measure of finality and certainty to the results achieved." (*Bowman v. City of Petaluma, supra*, 185 Cal.App.3d at p. 1074.) The statute accordingly requires evidence of such "substantial changes" in the project or surrounding circumstances that "major revisions" of the prior EIR are required. (See § 21166; *Fund, supra*, 204 Cal.App.3d at p. 1552.) Likewise, under the third exception permitting subsequent review based on "new information," a new EIR is not required "whenever '*any* new, arguably significant information or data' is proposed, 'regardless of whether the information reveals environmental bad news.' [Citation.]" (*River Valley Preservation Project v. Metropolitan Transit Development Bd., supra*, 37 Cal.App.4th at p. 168.) Rather, the Guidelines clarify that the new information justifying a subsequent EIR must

be "of substantial importance" and must show that the project will have "significant effects not discussed in the previous EIR or negative declaration," that "[s]ignificant effects previously examined will be substantially more severe" than stated in the prior review, or that new mitigation measures now exist, or are now feasible, but are not being adopted by the project's proponents. (Guidelines, § 15162, subd. (a)(3); cf. *Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1126–1129 [26 Cal.Rptr.2d 231, 864 P.2d 502] [" 'significant new information' " requiring recirculation of an EIR under section 21092.1 must concern a *"substantial* adverse environmental effect of the project" or a feasible mitigation that is not being implemented].)

Our standard of review for an agency's decision under section 21166 is well settled. "We independently review the administrative record. [Citation.] We resolve reasonable doubts in favor of the administrative decision. [Citation.] 'We do not judge the wisdom of the agency's action in approving the Project or pass upon the correctness of the EIR's environmental conclusions. [Citations.] Our function is simply to determine whether the agency followed proper procedures and whether there is substantial evidence supporting the agency's determination . . . .' [Citation.]" (*Santa Teresa Citizen Action Group v. City of San Jose* (2003) 114 Cal.App.4th 689, 704 [7 Cal.Rptr.3d 868], fn. omitted.) "Substantial evidence has been defined as 'relevant evidence that a reasonable mind might accept as adequate to support a conclusion' [citation], or 'evidence of "ponderable legal significance . . . reasonable in nature, credible, and of solid value" ' [citation]." (*Bowman v. City of Petaluma, supra,* 185 Cal.App.3d at p. 1072.) In applying substantial evidence review, a court may not weigh the evidence (*ibid.*); rather, we simply determine whether the record contains substantial evidence to support the agency's decision. (*A Local & Regional Monitor v. City of Los Angeles* (1993) 12 Cal.App.4th 1773, 1799 [16 Cal.Rptr.2d 358]; *Fund, supra,* 204 Cal.App.3d at p. 1545.) "[I]f there are conflicts in the evidence, their resolution is for the agency. [Citations.]" (*Sierra Club v. County of Sonoma, supra,* 6 Cal.App.4th at p. 1317; see also *Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1135 [reasonable doubts must be resolved in favor of the administrative decision].)

B. *County's Findings of New Information Under Section 21166*

As an alternative to its resolution declaring Moss's 2004 submission to be a new CEQA project, the County's Board of Supervisors issued a resolution finding that additional CEQA review of the project is required based on the existence of new information not previously available or discussed in the

1997 mitigated negative declaration. The Board identified two categories of new information: (1) evidence about the project's impacts on the water supply in the City of Trinidad; and (2) evidence about impacts to biological resources, specifically the coho salmon and the coastal cutthroat trout. Consistent with our standard of review, we must review the administrative record to determine whether substantial evidence supports the County's findings that new information, not previously available, indicates "[t]he project will have one or more significant effects not discussed in the previous . . . negative declaration," or that "[s]ignificant effects previously examined will be substantially more severe" than previously understood. (Guidelines, § 15162, subd. (a)(3); see also § 21166, subd. (c).)

### 1. *Water Impacts in City of Trinidad*

The project's original mitigated negative declaration relied in part on a water assessment evaluation conducted for Luffenholtz Creek in 1995. This study showed that, even in a dry year, Luffenholtz Creek could supply an additional 224 hookups beyond the four hookups that would be used by the Moss subdivision. Including hookups from the Moss project, the study projected the creek could accommodate approximately a 74 percent increase over the current number of water users in the City of Trinidad. Based on this study, the County's planning staff concluded the project would not cause a substantial reduction in the amount of water available for Trinidad, although it would slightly reduce the surface water in Luffenholtz Creek.

In May 2004 and August 2005, the City of Trinidad's water commissioner Chi-Wei Lin[9] submitted two letters to the planning department asking the County to reevaluate the environmental impacts of the project. From these letters, which were considered to constitute an expert opinion, the Board of Supervisors determined that the 1995 study of Luffenholtz Creek was outdated and no longer valid. The Board found that water usage in the City of Trinidad had increased by 73 percent since 1995, thus bringing usage close to the maximum capacity the creek was expected to be able to provide. Adopting Lin's opinion that any additional water demands would have "a much more serious impact to the City's water supply" than they would have had 10 years earlier, the Board predicted the situation would become even more dire in the next 10 to 20 years.

In addition to expressing concerns about the increased quantity of water the project could draw from the creek, Lin's letters also cautioned that the project could add contaminants to the water, thus hindering Trinidad's ability to comply

---

[9] Between May 2004 and August 2005, Lin was elected mayor of Trinidad. As indicated in an August letter, Lin also continued to serve as the city's water commissioner.

with stricter state water quality standards that became effective in 2003. The Board adopted Lin's opinion that "any increase in contamination due to an increase in development will have a greater impact on the City's ability to maintain the required water quality standards." Finally, the Board found that the threat of forest fires near Trinidad had "increased substantially" in the preceding seven years and this fact, combined with the "shortage of water" generated by increased draws from Luffenholtz Creek, required the project's impact on fire safety to be reexamined.

Substantial evidence supports the Board of Supervisors's finding that supplemental environmental review is required to analyze the project's potential to contribute to a water shortage downstream in the City of Trinidad. "Substantial evidence" under CEQA "includes fact, a reasonable assumption predicated upon fact, or expert opinion supported by fact." (§ 21080, subd. (e)(1).) The Board based its decision on the Trinidad water commissioner's expert opinion that Luffenholtz Creek was already supplying water to users in Trinidad at or close to the maximum capacity projected in the 1995 study. This opinion was supported by Lin's own charts and reports from the state Department of Water Resources, which showed that between 1994 and 2003 Trinidad increased its water production by 74 percent (from 26 million to 45 million gallons). Thus, the data shows that, as of 2003, the city's demand for water from Luffenholtz Creek had increased by 74 percent—the critical "maximum capacity" figure stated in the 1995 study upon which the mitigated negative declaration for the project relied. This evidence of increased water usage is new and could not have been known at the time the project was previously reviewed. Although the increased water demand created by the project's addition of four new parcels would likely be "slight[]," as the County's planners originally predicted, evidence that demand upon Luffenholtz Creek was at or near the creek's maximum capacity in 2003 indicates even such a slight increase in demand from the project could have significant environmental impacts downstream.

Moss attempts to impeach Lin's opinion by arguing that the 1995 study was an evaluation of the capacity of Trinidad's water treatment plant, not an analysis of how much water the creek can supply; therefore, according to Moss, the problem lies in Trinidad's treatment facilities and not the creek itself. However, the evidence submitted in support of Lin's opinion indisputably shows water demand increased significantly in Trinidad in the years since the project was first reviewed. The evidence thus undermined a fundamental assumption of the mitigated negative declaration—i.e., that Trinidad's water demand was well below the threshold at which additional demand from the project could become a concern. Moreover, if Moss's

characterization of the 1995 study is correct, it means the ability of Luffenholtz Creek to supply adequate water to both the project and the City of Trinidad has *never actually been studied.*[10] Such a circumstance would equally justify the County's conclusion that further study is required.

The Board of Supervisors made two additional findings regarding impacts of the project on water quality in Luffenholtz Creek and on Trinidad's firefighting capabilities. However, it is unclear whether the County is continuing to assert that further review of these potential impacts is required. Moss challenged all of the Board's findings in his petition for writ of mandate. Although the trial court found the record contained substantial evidence of new information about significant environmental effects, thus justifying further review under section 21166, the court's order describes only two categories of such new information: (1) "the availability of water for the project, in light of the increased usage for the City of Trinidad"; and (2) "[s]ignificant fisheries issues." A fair reading of the court's order suggests the court found substantial evidence to support further review of these impacts *only.* The County did not appeal from this aspect of the trial court's order, nor—tellingly—does the County argue in its respondent's brief that the record contains substantial evidence of new information regarding significant impacts on water quality or fire safety.[11]

To the extent the County has not abandoned its position that supplemental environmental review is required under section 21166, subdivision (c) based on new information about the project's impacts on water quality and fire safety, we conclude the Board of Supervisors's findings on these subjects are not supported by substantial evidence. The Board adopted Lin's expert opinion that, in light of the state's recent adoption of more stringent water quality standards, "any increase in contamination due to an increase in development will have a greater impact on the City's ability to maintain the required water quality standards." This opinion did not justify a subsequent or supplemental report under either of the first two alternatives specified in section 21166 (substantial changes in the project or with respect to the circumstances under which the project is being undertaken). (§ 21166, subds. (a), (b).) The change in the water quality standards was new information that was not known and could not have been known when the mitigated negative declaration was prepared and thus satisfies the third criterion. (§ 21166, subd. (c).) However, section 15162 of the Guidelines amplifies this

---

[10] If this is the case, it may explain Lin's complaint that in 1997 the County had not fully addressed Trinidad's concerns about water supply impacts from the project.

[11] Although the County recites background facts and findings about water quality and fire safety, the brief discusses only impacts on water quantity and protected fish species in its argument that substantial evidence supports a subsequent EIR.

criterion by requiring that the new information be "of substantial importance" and make one of four possible showings.[12] Lin's opinion makes no showing of any of them. Neither his opinion nor anything else in the record provides evidence that the project will in fact contribute contaminants to Luffenholtz Creek, much less that it will do so to any significant degree. Indeed, the record does not even contain evidence about levels of contaminants currently found in Trinidad's water supply. Lin's opinion that any increase in development upstream could result in increased levels of contaminants, and make it more difficult for Trinidad to meet state water quality standards, does not constitute substantial evidence because it is based on speculation, not fact. (§ 21080, subd. (e)(2) ["Substantial evidence is not argument, speculation, unsubstantiated opinion or narrative . . ."].) Obviously, the addition to the water supply of even trivial amounts of a contaminant will theoretically make it more difficult for a downstream municipality to meet water quality requirements. This observation alone, however, is not new information "of substantial importance" showing the project will have significant or substantially more severe environmental effects than were previously understood. (See Guidelines, § 15162, subd. (a)(3).)

The Board's finding that the project could impair firefighting capabilities in Trinidad also lacks adequate support in the record. This finding is based entirely on Lin's statement that the threat of forest fires in the Trinidad area "ha[d] increased substantially" in the preceding seven years, and his prediction that any shortage of water created by the project's additional draws upon the creek could cause an increase in the fire danger to Trinidad. However, Lin provided and the Board considered no facts to support the claim of an increased fire hazard. Although Lin asserts the danger has "increased," the project's impact on fire safety was studied before, and the County's planning staff concluded the project would have a "positive effect upon fire protection services" because of road improvements and other fire safety measures Moss was undertaking. The only "new" information presented to the Board in 2005 was Lin's observation that the threat of forest fire had apparently increased since the prior review. Indeed, Lin himself noted in his August 2005 letter to County planners, "The issue of fire safety is not new." Lin's observation

---

[12] The new information may show any of the following: "(A) The project will have one or more significant effects not discussed in the previous EIR or negative declaration; [¶] (B) Significant effects previously examined will be substantially more severe than shown in the previous EIR; [¶] (C) Mitigation measures or alternatives previously found not to be feasible would in fact be feasible and would substantially reduce one or more significant effects of the project, but the project proponents decline to adopt the mitigation measure or alternative; or [¶] (D) Mitigation measures or alternatives which are considerably different from those analyzed in the previous EIR would substantially reduce one or more significant effects on the environment, but the project proponents decline to adopt the mitigation measure or alternative." (Guidelines, § 15162, subd. (a)(3).)

simply is not new information of significant or substantially more severe environmental effects sufficient to justify supplemental review. (See § 21166, subd. (c); Guidelines, § 15162, subd. (a)(3).)

As a practical matter, however, we realize that the issue of fire safety is closely related to the issue of the adequacy of the water supply to the City of Trinidad. If the project's increased draws from Luffenholtz Creek result in a water shortage downstream in Trinidad, such a shortage could hamper the city's ability to combat forest fires in the region. We have already concluded supplemental review is necessary to address the project's environmental impacts on water supply to the City of Trinidad. Although substantial evidence does not support further review of the broad topic of "fire safety," we believe the supplemental analysis of impacts on water supply should take account of and address Mayor Lin's concerns about the availability of sufficient water for the City of Trinidad to respond to fire hazards.

### 2. *Biological Impacts*

The second category of new information the County's Board of Supervisors cited in support of its decision to require a supplemental EIR concerns the project's potential impacts on two threatened fish species, the coho salmon and the coastal cutthroat trout.

### a. *Coho Salmon*

Northern California coastal coho salmon were identified as a threatened species on the federal endangered species list in 1997. Based on analysis from the County's planning staff, the Board of Supervisors found that "Luffenholtz Creek is within the mapped habitat area for this group of salmon." The Board concluded the new information listing coho as a threatened species and identifying Luffenholtz Creek as within the species' critical habitat warranted further environmental review of the project's impacts on this fish population.

The County points to various publications appearing in the Federal Register to support these findings. The record does establish, and Moss concedes, that coho salmon are now listed as a threatened species in the northern California coastal region. (See 69 Fed.Reg. 33102, 33104 (June 14, 2004).) Support for the Board's finding that Luffenholtz Creek is within this species' critical habitat is less clear, however. The County relies on a rule published by the National Marine Fisheries Service designating critical habitats for several species of salmon and steelhead trout. (65 Fed.Reg. 7764 (Feb. 16, 2000).) This rule identifies certain watersheds in Humboldt County as the critical habitat for *chinook* salmon (65 Fed.Reg. 7764, 7774, 7782 (Feb. 16, 2000)),

but the only critical habitat it mentions for *coho* salmon is on the Oregon coast. (65 Fed.Reg. 7764, 7775, 7782–7783 (Feb. 16, 2000).) The County's interpretation of this rule seems to deliberately confuse these two species of salmonids. Yes, the rule designates a critical habitat for California coastal chinook salmon in the Mad River/Redwood Creek watersheds in Humboldt County (65 Fed.Reg. 7764, 7774, 7782 (Feb. 16, 2000)); and, yes, the rule states that "critical habitat includes all waterways, substrate, and adjacent riparian zones below longstanding, naturally impassable barriers . . . ." (65 Fed.Reg. 7764 (Feb. 16, 2000).) However, even assuming the two creeks running through the Moss property are adjacent to the Mad River/Redwood Creek watersheds (a point asserted by the County but without support in the record), these facts establish only that the project may fall within a critical habitat for coastal chinook salmon. The critical habitat designated for coho salmon in this rule refers only to waterways in Oregon. (65 Fed.Reg. 7764, 7782–7783 (Feb. 16, 2000).)

Evidence Moss submitted below is in accord. An August 10, 2005, database listing of threatened species in all of Humboldt County includes the Southern Oregon/Northern California coho salmon, but when the region under review is narrowed to the "Trinidad Quad," the database lists only coastal chinook—but not coho—as a threatened fish species found within this critical habitat.[13]

The County's reliance on broad descriptions of the coho habitat is also inappropriate in light of evidence the County's own planners discovered showing it is nearly impossible for anadromous fish, such as salmon, to enter Luffenholtz Creek from the ocean. In the initial study of the project completed in May 2005, the planning department observed that at the point where Luffenholtz Creek reaches the Pacific Ocean, approximately a mile south of Trinidad, two culverts have been constructed that "would make anadromous fish passage very difficult if not impossible," according to a 2002 study.

The County has directed us to nothing in the administrative record establishing that Luffenholtz Creek is part of the critical habitat for *coho* salmon. Instead, the County relies on federal rules regarding California coastal chinook and Northern California steelhead and implies that, because the County's senior planner testified about all of these species, evidence

---

[13] A federal rule discussing listings for several west coast salmonids observes that coho "is a widespread species of Pacific salmon, occurring in most major river basins around the Pacific Rim from Monterey Bay, California, north to Point Hope, Alaska, through the Aleutians, and from the Anadyr River south to Korea and northern Hokkaido, Japan [citation]." (69 Fed.Reg. 33102, 33109 (June 14, 2004).) This summary describes a remarkably far-ranging habitat but does not substantially support the Board's conclusion that coho exist in Luffenholtz Creek. That coho salmon may be found anywhere from Japan to Alaska to Monterey Bay does not mean they are to be found *everywhere* in this region.

pertaining to any or all of them may be used to support the Board's findings.[14] The question before us on appeal, however, is whether substantial evidence supports the Board of Supervisors's findings in resolution No. 05-56. The Board did not make any findings about chinook salmon or steelhead in this resolution (which was apparently drafted by the County); therefore, evidence and arguments regarding these different species are not relevant. If the Board of Supervisors believed potential impacts of the project upon California coastal chinook or Northern California steelhead required further study, it should have made such a finding. As it is, because the Board's findings are limited to coho salmon and cutthroat trout, the County's reliance on evidence pertaining to different species strikes us as improper bootstrapping.

Although substantial evidence does show that coho salmon are listed as a threatened species, we find no evidence in the administrative record to support the Board's finding that coho salmon have a habitat in or near the project's waterways. When impacts on fish species were previously studied, the National Marine Fisheries Service determined that, with the implementation of prescribed mitigation measures, the project was "generally protective of listed salmonids." The only thing that has changed since the previous study, according to the evidence in the record, is that Northern California coastal coho salmon have been identified as a threatened species. However, without information indicating the species may be found within or near the project, such a listing alone does not constitute substantial evidence of significant impacts justifying further environmental review under section 21166. (Cf. *Chaparral Greens v. City of Chula Vista* (1996) 50 Cal.App.4th 1134, 1139, 1149 [58 Cal.Rptr.2d 152] [recirculation of EIR not required due to new listing of an endangered species where project's impact on the species was previously studied and discussed in the EIR].)

### b. *Coastal Cutthroat Trout*

In resolution No. 05-56, the Board of Supervisors also found that further environmental review of the project was necessary due to new information about significant impacts to coastal cutthroat trout. The Board stated: "Since 1997, it has been determined that the main stem of Luffenholtz Creek provides habitat for Coastal Cutthroat Trout . . . , among other species. Residents of the area contend that there are Coastal Cutthroat trout in the more upstream reaches of the creek that do not migrate to the sea in a truly anadromous fashion. Coastal Cutthroat Trout are a Species of Special Concern."

---

[14] In discussing the critical habitat of threatened species, the planner testified only about chinook and steelhead. He mentioned coho salmon only to note that they were listed as a threatened species in 1997.

In contrast to the Board's findings regarding coho salmon, these statements about coastal cutthroat trout do have support in the administrative record. A June 1995 report of the California Department of Fish and Game lists coastal cutthroat trout as a "species of special concern" and describes its distribution as "coastal streams from the Eel River, Humboldt County, to Seward in southeastern Alaska [citation]." Populations of coastal cutthroat trout have been documented in several Humboldt County drainages, including those for Mad River and Redwood Creek. This report further notes that because cutthroat trout "spend a relatively substantial part of their lives in the estuaries of coastal streams, . . . threats to estuarine areas by dredging and filling can significantly impact the populations." Thus, although the record indicates coastal cutthroat trout are not listed as a threatened or endangered species by federal authorities, the California Department of Fish and Game considers this species to be at considerable risk from activities that could be undertaken as a result of the project.

Evidence in the record also suggests that the barriers preventing access to Luffenholtz Creek from the Pacific Ocean have not necessarily stopped the development of a population of cutthroat trout in the creek. In their May 2005 initial study of the Moss project, County planners remarked that despite the culverts, which rendered "the passage from ocean to creek . . . nearly impossible," local residents had observed coastal cutthroat trout in the creek.[15] The planners believed "[t]here may be 'resident' trout in the more upstream reaches of the creek that do not migrate to the sea in a truly anadromous fashion." In other words, the creek may be home to a population of cutthroat trout that do not move between ocean and freshwater in the manner typical of their species.

The record does not establish precisely when the state determined coastal cutthroat trout are a species of special concern, but the County's initial study suggests the presence of this species in Luffenholtz Creek had only recently been brought to its attention. Although evidence of the species' presence appears largely anecdotal, we must resolve our doubts on this point in favor of the County. (*Laurel Heights Improvement Assn. v. Regents of University of California, supra,* 6 Cal.4th at p. 1135.) Thus, we conclude substantial evidence supports the Board's finding that further review of the project's impacts on the population of coastal cutthroat trout is required. Assuming cutthroat trout are present in Luffenholtz Creek, as believed, the 1995 report of the Department of Fish and Game indicates activities that may occur in connection with the project have the potential to result in significant impacts to this species.

---

[15] No residents testified to this effect at the Board of Supervisors's August 16, 2005 hearing, however.

## DISPOSITION

The judgment of the trial court denying Moss's petition for writ of mandate and requiring preparation of a new EIR with respect to issues addressed in resolution No. 05-56 is reversed in part. The County may require a supplemental review under section 21166 *only* with respect to the project's environmental impacts on (1) water supply to the City of Trinidad, and (2) the population of coastal cutthroat trout. In all other respects, the judgment is affirmed. Each side shall bear its own costs on appeal.

Pollak, J., and Jenkins, J., concurred.